### SIMPSON'S PATENT DRY-DOCK CO. v. ATLANTIC & E. S. S. CO.

(Circuit Court of Appeals, First Circuit.    April 18, 1901.)

No. 343.

1. NEGLIGENCE—ACTION FOR DAMAGES—EVIDENCE CONSIDERED.

Evidence considered, and *held* to show that a dock company was guilty of negligence in failing to have its dry dock and appliances in suitable condition to receive a large steamer docked for repairs therein, and to render it liable in damages for the injury resulting to the vessel from falling while being docked.

2. APPEAL—FINDINGS BELOW.

The rule applied, with reference to an issue of fact, that the finding of the commissioner of the district court, supported by the district court, will be regarded on appeal as, in effect, "successive and concurrent decisions of two courts in the same case."

3. DEMURRAGE.

Where the damage to a ship, received through the negligence of a person chargeable therefor, is repaired in a dock, and at the same time other work is done on the ship to a very considerable amount, which other work was not required at that particular time, the party chargeable must pay the entire demurrage, notwithstanding the other repairs. Ruabon S. S Co. v. London Assurance [1900] App. Cas. 6, considered.

Appeal from the District Court of the United States for the District of Massachusetts.

Eugene P. Carver and Edward E. Blodgett, for appellant.

Lewis S. Dabney (Frederick Cunningham, on the brief), for appellee.

Before COLT and PUTNAM, Circuit Judges, and WEBB, District Judge.

PUTNAM, Circuit Judge. The appellant undertook to dock at Boston the steamship belonging to the libelant, for the purpose of permitting repairs to be made of damages which had occurred during her voyage. She was of iron, 400 feet long, and of 4,904 gross tons, and therefore large and heavy. The owner of the dock was, of course, bound to use reasonable care in docking her; and, under the circumstances, in view of her size and weight, "reasonable care" means a dock in suitable condition, and very great diligence and skill. Mather v. Rillston, 156 U. S. 391, 15 Sup. Ct. 464, 39 L. Ed. 464; Railway Co. v. Barrett, 166 U. S. 617, 619, 17 Sup. Ct. 707, 41 L. Ed. 1136. The other introductory facts are sufficiently stated in the opinion of the learned judge who disposed of the case in the district court. The

theory now advanced by the ship is as follows: She has a very flat floor,—a "kettle bottom," so to speak. Her beam is 44 feet, while the distance between the dock's bilge blocks, when hauled back on its floor, is only 42 feet. The bilge blocks should have been hauled close to the sides of the dock and laid down. Instead of this, they were left standing upright, away from its sides, so that the vessel, as the water was drawn down, had grounded upon them at the bow before her keel forward touched the keel blocks; and, as the water fell, the keel of the vessel took the keel blocks at the stern, but the bow hung on the bilge blocks until the ship crushed the latter and dropped with a great crash. The ship also claims that the keel blocks were insufficient, and that the ship began to cut into those which were aft, and gradually cut in forward, until she crushed the bilge blocks and fell.

On the other hand, the theory of the dock company is that the ship had more draft than was reported; that she entered the dock with her stern to the port of the line of keel blocks; that, as the stern was being hauled over, it displaced some of the keel blocks aft; that thereupon the dock master directed the ship to be hauled out of the dock; that, in place of hauling her out, the captain of the ship made use of his steam winch and hauled her upon the keel blocks; and that then, on account of some of them being displaced, she began to crush into what remained aft, and so gradually settled until the catastrophe was accomplished. The learned judge of the district court found that the dock master did give an order to haul the ship out, but that the order was only the exclamation of a man frightened at finding himself in a position of responsibility, and also, in substance, that he acquiesced in the ship remaining in the dock. The difficulty with the appellant's theory is that it does not account for the manner in which the ship fell. While all parties claim that she first settled on the keel blocks aft, and also that she then began to settle gradually from aft forward, yet there is no evidence to justify finding that settling on the keel blocks in a right line would have resulted in any injury. Moreover, when she fell she fell with a crash so loud as to bring people from the street. This crash was clearly something connected with the falling of the ship from a height, and could not have been an accompaniment of her merely crushing down the keel blocks. She fell, moreover, with a list to the starboard forward; and, what is more conclusive, she fell with her bow forward to the starboard, and almost entirely, if not entirely, away to the starboard of the keel blocks, and clear of them. So far as she did not fall clear of them, the keel blocks forward were crushed down at the ends to the starboard of the ship, while the ends to her port were lifted. All this shows conclusively that the ship's bow was thrown to the starboard to a substantial distance. None of these facts is consistent with the theory of the dock company, but they are all consistent with the ship's theory, and they exclude any other almost to a certainty.

The dock company denies that the bilge blocks had been left standing upright in the dock, away from its sides. Its claim is that the dock master, on finding the ship was settling, ordered them to be

drawn towards the center of the dock, in order to support her forward. This order was given, but it was only partially complied with. Flewelling, who was employed by the dock company, testifies that the dock master said to him that the ship seemed to be crushing all the keel blocks underneath her, and that he might haul in two or three of the forward bilge blocks. He adds:

"We then hauled the port forward block till it fetched up against the plates on the ship's side, and we tried to haul the second one, and before it got out to its place it either caught, or something gave way,—the chain or rope. * * * Then we went around to the other side, and we hauled two on the starboard side, and went to haul the third one, and the chain broke."

Weaver, another employé of the dock company, testifies that he helped to haul one of the bilge blocks forward on the port side. He took a bar to start one of them, which appeared to be frozen or stuck. He did not move it.

The evidence in behalf of the ship with reference to the bilge blocks, is of a very positive character. Booth, who was the libelant's general agent and marine superintendent at Boston, testifies that when the survey occurred, on February 6th, the next day after the injury to the ship, he noticed two bilge blocks on her port side, forward of the main rigging, close to her; that these blocks were crushed; and that there was a slight indentation and scraping on the ship's hull, as if she had rested on them. Duncan, who was the ship's chief engineer, testifies that, the day after the injury to the ship, he saw that she had broken down through the keel blocks; that they were crushed completely down into small splinters; that the forward bilge block on the port side was crushed; that there was an indentation in the plating of the ship, caused by the ship resting heavily on the corner of that block; that "No. 2 block from the forward" was crushed somewhat in a similar manner to the other block; and that there was a mark on the ship's side where the ship had scoured down the edge of No. 2. No. 2 was a bilge block. In fact, there is no contradiction on the point that the ship caught on the bilge blocks. The only differences between the ship and the dock company are as to which, and how many, of the bilge blocks the ship caught on, and as to the reason for their being under the ship's bilge. The witnesses for neither party are clear or specific as to the precise number and location of those which were under her. However, none of these discrepancies is of consequence. It is plain that the bilge blocks were fitted with unsuitable chains, which broke; that they were allowed to be frozen in or to be stuck; and that the failure to place them suitably arose in part from a lack of efficient measures, and in part from their unsuitable condition. The result was that one or more bilge blocks were hauled in under the port of the ship's bow, and forced her nose to the starboard, practically off from the forward keel blocks, so that when they were crushed she fell to the starboard, receiving the strain which was the cause of the substantial injury she suffered. On this point the case is clearly against the dock company,—not only that the injury to the ship was caused by the bilge blocks, but also that the efficient reason that they were injurious was its negligence in reference to them.

This leaves only the question of damages. On this branch of the case the court below sustained the finding of the commissioner; and, in accordance with the rule stated by us in The Providence, 38 C. C. A. 670, 98 Fed. 133, 135, the result is, in effect, "successive and concurrent decisions of two courts in the same case" on what are mainly mere questions of fact. It is therefore not easily overthrown. The facts are sufficiently stated by the learned judge who sat in the district court in his opinion with reference to the exceptions taken by the parties to the commissioner's report. That report classified the damage into five items. Of course, there is an opportunity for differences of opinion with reference to particulars; but, in view of the straining which the ship received, there can be no doubt that the gross amount awarded was reasonable, and we need concern ourselves with only the practical result.

The damage which the ship received was repaired in a dock in England, and at the same time other work was done, to a very considerable amount. On this account the dock company claims that demurrage during the repairs should not have been allowed. The district judge, however, shows correctly that the other work was not required at that particular time, and that, as the ship was not laid off for that work, it might, in fact, never have been done. Ruabon S. S. Co. v. London Assurance [1900] App. Cas. 6, although relating to an adjustment of general average, lays down a rule which apparently supports that view of the law. However, for the reason already stated, to the effect that the gross allowance was plainly reasonable, we do not find it necessary that we should even impliedly adopt any rigid rule which would form a precedent for other cases. We approve the determination of the district court with reference to the amount of damages as a whole, without needing to criticise the several items which entered into it.

The decree of the district court is affirmed, with interest, and the costs of appeal are awarded to the appellee.