HINES, Agent, v. SANGSTAD S. S. CO. et al.

(Circuit Court of Appeals, First Circuit. July 2, 1920.)

No. 1465.

1. Shipping ⟨key⟩3½, New, vol. 8A Key-No. Series—Admiralty has jurisdiction of suits against carrier under federal control.

That Federal Control Act March 21, 1918, § 10 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115¾j), authorizing suits against carriers while under federal control, specifies only "actions at law and suits in equity" *held* not to have the effect of excluding suits in admiralty, especially in view of the construction placed on the provision by General Orders of Director General No. 50 and Transportation Act Feb. 28, 1920, both of which recognize such suits as within the intendment of the statute.

2. Railroads ⟨key⟩5½, New, vol. 6A Key-No. Series—Action against carrier under federal control not limited.

Actions against carriers while under federal control, authorized by Federal Control Act March 21, 1918, § 10 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115¾j), are not limited to such as arise out of a breach of some duty imposed on defendant as a common carrier.

3. Shipping ⟨key⟩58(3)—Charterer entitled to allowance for time lost in repairing damage to ship.

In a suit by a charterer for damage to the mast of the ship, necessitating repairs before her next voyage, libelant *held* entitled to allowance for time lost while they were being made, without deduction because it was time when she should have been dry-docked under the terms of the charter, where she was not, or because the time was utilized for making other minor repairs, which would not have necessitated laying her up.

Appeal from the District Court of the United States for the District of Massachusetts; James M. Morton, Jr., Judge.

Suit in admiralty by the Sangstad Steamship Company and another against Walker D. Hines, Agent. Decree for libelants (266 Fed. 390), and respondent appeals. Affirmed.

Damon E. Hall, of Boston, Mass. (Henry F. Hurlburt, of Boston, Mass., on the brief), for appellant.

Robert G. Dodge, of Boston, Mass. (Raymond S. Wilkins, of Boston, Mass., on the brief), for appellees.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. The libelants are the Sangstad Steamship Company and the United Fruit Company. The former was the owner and the latter the charterer of the steamer Sangstad, and they seek to recover damages which they sustained by reason of an accident to the steamer, due to the alleged negligence of the libelee. The libel was filed September 3, 1918. It was originally brought against James H. Hustis, receiver of the Boston & Maine Railroad. After the issuance of General Orders Nos. 50 and 50–A of the railroad administration, Walker D. Hines, Director General, was substituted as libelee. On March 29, 1920, and before entry of final decree, federal control of the railroads having terminated, Walker D. Hines, Agent, under section 206 of the Transportation Act of February 28, 1920, was

⟨key⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

made libelee. March 29, 1920, a final decree was entered in the cause, adjudging that the Sangstad Steamship Company recover as damages the sum of $2,669.95, with interest, amounting to $321.72; that the United Fruit Company recover damages in the sum of $15,473.32, with interest, amounting to $1,972.85; and that the libelants recover costs, taxed at $596.95. From this decree the libelee appealed.

Three questions are raised by the appeal: (1) That the District Court was without jurisdiction in admiralty to hear and determine the libel; (2) that the libelants failed to prove that the damage occasioned the ship was due to the fault of the libelee; and (3) that the court erred in allowing as damages 8½ days for loss of time consumed in repairs, instead of 3 days, as allowed by the assessor.

[1] By an act of Congress of August 29, 1916 (39 Stat. 619, 645, c. 418 [Comp. St. § 1974a]), the President was authorized to take over the management of the railroads, and on December 26, 1917, he issued a proclamation by which the railroads of the country, including the Boston & Maine System, were taken over on the 28th of December, 1917. In the proclamation the President designated a Director General of Railroads and provided that "suits * * * [might] be brought by and against said carriers and judgments rendered as hitherto until and except so far as said director may, by general or special orders, otherwise determine," but that "no attachment by mesne process or on execution shall be levied on or against any of the property used by any of said transportation systems in the conduct of their business as common carriers," except with the prior written assent of said director.

The accident in question occurred February 14, 1918, but before this proceeding was instituted Congress passed the act of March 21, 1918 (40 Stat. 451, c. 25 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115¾a–3115¾p]), known as the Federal Control Act, section 10 (section 3115¾j) of which provided:

"Carriers while under federal control shall be subject to all laws and liabilities as common carriers, whether arising under state or federal laws or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such federal control or with any order of the President. Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law; and in any action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the federal government. * * * But no process, mesne or final, shall be levied against any property under such federal control."

March 29, 1918, the President issued a further proclamation in which he authorized the Director General to exercise all the powers which the foregoing "act, or any other act in relation to the subject hereof, the President is authorized to do and perform." 40 Stat. pt. 2, pp. 1763, 1764. October 28, 1918, the Director General issued General Order No. 50, the material portions of which, as amended by General Order No. 50–A, are as follows:

"It is therefore ordered, that actions at law, suits in equity, and proceedings in admiralty hereafter brought in any court based on contract, binding upon the Director General of Railroads, claim for death or injury to person, or for loss and damage to property, arising since December 31, 1917, and growing out of the possession, use, control, or operation of any railroad or

system of transportation by the Director General of Railroads, which action, suit, or proceeding but for federal control might have been brought against the carrier company, shall be brought against the Director General of Railroads and not otherwise: Provided, however, that this order shall not apply to actions, suits or proceedings for the recovery of fines, penalties and forfeitures. * * *

"The pleadings in all such actions, suits in equity, or proceedings in admiralty, now pending against any carrier company for a cause of action arising since December 31, 1917, based upon a cause of action arising from or out of the operation of any railroad or other carrier, may on application be amended by substituting the Director General of Railroads for the carrier company as party defendant and dismissing the company therefrom."

February 28, 1920, Congress enacted what is known as the "Transportation Act," whereby it terminated federal control on March 1, 1920. In section 206 of this act it is provided:

"(a) Actions at law, suits in equity and proceedings in admiralty based on causes of action arising out of the possession, use, or operation by the President of the railroad or system of transportation of any carrier (under the provisions of the Federal Control Act, or of the act of August 29, 1916) of such character as prior to federal control could have been brought against such carrier, may, after the termination of federal control, be brought against an agent designated by the President for such purpose. * * *

"(d) Actions, suits, proceedings * * * of the character above described pending at the termination of federal control shall not abate by reason of such termination, but may be prosecuted to final judgment, substituting the agent designated by the President under subdivision (a)."

Although the libelants' cause of action arose during that period of federal control embraced within the first proclamation of the President, still, as the libel was not brought until after Congress had enacted the Federal Control Act of March 21, 1918, and in that act proceedings in admiralty were not specifically named among the actions that could be brought, the libelee contends that there was no authority sanctioning the bringing of this proceeding in admiralty. In furtherance of this contention the libelee says that General Orders No. 50 and No. 50-A did not relieve the situation; that by these orders the Director General did not intend to authorize the bringing of proceedings in admiralty; that all he intended to do was to authorize the substitution of the Director General for the carrier corporation as the party against whom proceedings should be brought; that, if he did intend to authorize the bringing of proceedings in admiralty, he had no authority to do so; and that, the suit being in effect a suit against the United States, it "could not be impleaded in a judicial tribunal, except so far as * * * [it has] consented to be sued."

If the libelee were right in his contention, it would result that Congress stayed the operation of that great body of law known as admiralty, and remitted the parties to proceedings at law and in equity, so far as controversies might arise with respect to carriers by land or by sea that were being operated under federal control. That such was the intention of Congress seems inconceivable, and, if such an interpretation is the one that might be given the language used in the act of March 21, 1918, considered by itself, we do not think, in view of the practical interpretation put upon the act by the department of the government charged with its administration and by Congress in the

act of February 28, 1920, in which it states that proceedings in admiralty "pending at the termination of federal control shall not abate by reason of such termination, but may be prosecuted to final judgment," that it is the interpretation which Congress could have intended or did intend in the enactment of the law.

[2] A further contention on the part of the libelee is that, under section 10, carriers under federal control are liable and may be sued for breaches of duty arising only from their obligations as common carriers; that, if the accident was due to a breach of some duty not imposed on the carrier as a common carrier, no action could be brought against the carrier under the act of March 21, 1918, either at law, equity, or in admiralty; and that, inasmuch as the evidence does not disclose that, at the time of the accident, the railroad property was being used for common carrier purposes, the District Court was, for this reason, also without jurisdiction. In support of this contention he cites the case of Friesen v. Chicago, R. I. & P. Ry. Co. (D. C.) 254 Fed. 875, 878. We have examined that case and do not regard it as authority for any such proposition. It stands clearly for the proposition that an action at law may be maintained against a carrier under federal control upon a cause of action not arising against it as a common carrier, and that the bringing of such action is not subject to the order of the President limiting the district in which it could be commenced, because of anything contained in section 10 of the act of March 21, 1918.

Upon the question of liability the libelee's contention is that there was no evidence warranting a finding that he was at fault for the injury to the Sangstad's mainmast. The only evidence in the case was that introduced by the libelants. That evidence showed that neither the owner nor the charterer was in any way at fault; that the steamer was tied up at Mystic Dock, and her cargo of coal was being discharged by the use of apparatus on the dock belonging to the Boston & Maine Railroad, which was under the control of the Director General of Railroads, and was operated by his agents and servants; that the apparatus consisted in part of a horizontal boom, which projected over the vessel, and from which a digger bucket was lowered into the hold; that the boom projected between the masts of the vessel, certain of whose stays were let go in order to allow it to take a proper position; that the discharging apparatus, including the boom, was movable horizontally, the boom being so arranged that it could be hoisted clear of the mast; that, having completed the discharge of hatches 1, 2, and 3, the boom, not having been sufficiently raised, was moved against the mainmast with such force as to bend it, doing the damage complained of; that immediately after the damage had been done the boom was lifted clear of the mast, and moved past it, and the discharge continued; and that, at the time of the accident, the vessel was tied up at the dock and did not move against the boom. From this evidence we think the conclusion was warranted that the accident was due to the fault of the servants and agents of the libelee who were operating the boom.

[3] The District Judge allowed demurrage for 8½ days that were consumed in the repairs upon the mast and overruled the assessor, who allowed but 3 days. The reasons assigned for the assessor's action in allowing only 3 days are stated by the court below as follows:

"By the charter party the steamer was to be dry-docked every 6 months. She was last dry-docked before the accident on July 28 [1917]. As the accident happened on February 14th [1918] dry-docking was then overdue. It usually consumed 2½ days of the steamer's time. The assessor seems to have ruled, in effect, that the owners should have dry-docked the steamer and in connection therewith have made repairs on the mast, which would have saved 2½ days' lost time; his view being, as I understand it, that the dry-docking had to be done anyway, and the vessel had to be laid off for that purpose in the immediate future, and that therefore the injury to the mast did not pro tanto necessitate lost time. Deducting this 2½ days from the 8½ left 6 days, of which the assessor allowed only one-half, for the following reason: While repairs to the mast were going on, the charterers made certain repairs of cargo damage, i. e., injuries to stanchions, rails, hatch coamings, etc., caused by loading and discharging cargo. These repairs were not pressing, and could have been made without laying up the ship; but, as she had to be laid up to repair the mast, the charterers took advantage of the opportunity to make them at the same time. They cost more than the repairs to the mast. The respondent contends that such repairs had to be completed before the expiration of the charter party in August following, and that therefore they should be regarded as presently necessary work. The assessor * * * apportioned the 6 days' period between the two sets of repairs, and held the respondent liable only for one-half of it."

The first question, therefore, is whether the court below was right in overruling the assessor as to the 2½ days which he had allowed in reduction of the 8½ days consumed in repairing the damage to the mast.

It appears that the repairs to the mast were made at Boston without putting her into dry dock; that 8½ days were consumed in making the repairs, and that they were made as rapidly as possible; that it was good judgment to have the mast repaired immediately, and a reasonable thing to do; that the mast is the arm of the ship, by which she handles her cargo; that, after the mast was repaired, it was used in discharging cargo at Cuba, where she went before going into dry dock at Baltimore; that dry-docking the steamer usually consumed 2½ days; and that, at the time the repairs to the mast were made, the time for dry-docking, within the express terms of the charter, was overdue. The terms of the charter as to dry-docking do not seem to have been strictly adhered to, as previous to the accident the Sangstad had been put into dry dock on August 24, 1914, April 12, 1915, March 18, 1916, September 25, 1916, and July 28, 1917, which shows that the average period between dry-docking had exceeded 6 months. But we do not regard this as material to a proper determination of the question under consideration.

In considering this question it is to be borne in mind that the charterer, by claiming demurrage for the 2½ days, is not seeking to make a profit out of the accident, but to be reimbursed for the loss of the use of the ship due to the libelee's negligence, and that the libelee, by insisting that the 2½ days be deducted, is endeavoring to impose upon the charterer the loss of the use of the ship during that time. The repairs to the mast were not necessary to make the ship seaworthy, but were required to render her useful in handling her cargo, and, in view of the contemplated voyage to Cuba, there was an especial reason why these repairs should be made at once. Under these circumstances it cannot be said that the charterer, even though it was under obligation

to the owner to dry-dock the ship in the near future, was bound to do so immediately (and at the time of the repairs to the mast) for the benefit of the libelee.

We know of no decisions involving like facts in which it has been held that the loss should be apportioned. See Simpson's Patent Dry Dock Co. v. Atlantic & E. S. S. Co., 108 Fed. 425, 47 C. C. A. 443. The cases relied upon by the libelee do not sustain any such position. Marine Insurance Co. v. China Transpacific S. S. Co., 11 App. Cas. 573; The Ruabon, [1900] App. Cas. 6; The Acanthus, [1902] Prob. Div. 17. The most they stand for is that, if the charterer had put the ship into dry dock and had her bottom cleaned and painted at the time the repairs to the mast were made, the 2½ days might be deducted; otherwise, the charterer would be making a profit.

At the time of the repairs to the mast the charterer had certain cargo repairs made. These repairs did not extend the time or in any way interfere with the work of making the repairs to the mast. The assessor, having deducted the 2½ days for the reasons before mentioned, divided the remaining 6 days, and allowed the charterer only 3 days. He did this, notwithstanding he had found that the cargo repairs were not necessary to make the ship seaworthy; that they could be made at any time before the expiration of the charter; and that they could be made without loss of time to the ship and while she was profitably employed in loading or discharging cargo. Clearly, under such circumstances, the charterer was not making a profit by being allowed the full time as demurrage, and we think the District Court was right in overruling the assessor as to both propositions.

The decree of the District Court is affirmed, with costs to the appellees.