PAN–AMERICAN PETROLEUM & TRANSPORT CO. v. UNITED STATES. THE NORMAN BRIDGE. THE RAPIDAN.

District Court, S. D. New York. July 7, 1927.

Collision ⚖️136—Shipowner is entitled to demurrage for full time of collision repairs made concurrently with others, neither being immediately necessary.

Tort-feasor is liable for demurrage during full time required for collision repairs, though other repairs were made concurrently, and though collision repairs, as well as the other repairs, were not immediately necessary.

In Admiralty. Libel by the Pan-American Petroleum & Transport Company, as owner of the steamship Norman Bridge, against the United States, as owner of the steamship Rapidan. On exceptions to report of special commission. Exceptions sustained in part, and overruled in part.

Burlingham, Veeder, Masten & Fearcy, of New York City (Chauncey I. Clark and C. B. Manley O'Kelley, both of New York City, of counsel), for libelant.

Emory R. Buckner, U. S. Atty., of New York City (Horace M. Gray, Sp. Asst. U. S. Atty., of New York City, of counsel), for the United States.

AUGUSTUS N. HAND, Circuit Judge. This cause comes up on exceptions filed by both parties to the report of W. H. McGrann, Esq., as special commissioner. The Norman Bridge was damaged on her port side above the water line by collision with the Rapidan, necessitating the fairing of three plates in the first and second strakes below the sheer, one plate being removed and the other two faired in place, and of certain longitudinals and brackets in the way of those plates, in order to restore the vessel to her condition prior to collision. The damage did not render the Norman Bridge "unseaworthy," in the sense that she could not perform all the ordinary services required of her, and she did perform such services by loading a cargo of oil, carrying it from Mexico to Fall River, Mass., and then proceeding to New York without any repairs. About one month was occupied in this service, when the Norman Bridge was sent to the works of Morse Dry Dock & Repair Company at New York to be repaired. During the 10 days she was there, the collision repairs were begun, continued, and completed, occupying the full time, including the time while the vessel was on the dry dock (the latter a little more than one day); but other repairs for owner's account, not incidental to the collision damage, were also made during the same period, part of which occupied the full period and ran along concurrently with the collision repairs.

These owner's repairs were:

(1) Renewing propeller and rewooding bottom stern bush, one blade of the propeller having been broken by striking a submerged object prior to the collision with the Rapidan. These repairs did not extend the time of collision repairs.

(2) Renewing one length of port bilge keel plate, injured by grounding of the vessel before the collision with the Rapidan. These repairs did not extend the time of collision repairs.

(3) Removal and fairing of one plate and the fairing of two other plates in place above the water line, and of longitudinals and brackets in the way of these plates, injured by striking a dock before the collision with the Rapidan. These repairs did not extend the time of collision repairs.

(4) Miscellaneous upkeep repairs, which may or may not have ultimately required laying up the vessel, but could not be made by the crew or while the vessel was under way.

The repairs were not immediately necessary, though it must be assumed that they would have been required at some time not too remote. Thus the collision repairs and owner's repairs stand on the same footing in respect to the fact that neither were "necessary" at the time they were made.

If, while collision repairs are in progress, the shipowner avails himself of the time to make other repairs unrelated to the collision, the tort-feasor is not thereby relieved of his

liability for demurrage during the full time required to effect collision repairs, unless the other repairs are necessarily made at that time. The commissioner finds the foregoing to be the general rule, and says that it does not matter if the other repairs would certainly have been made at some time later, so long as they need not have been made at the time in question. If they were, however, necessarily made to restore the ship to a seaworthy condition, or if the ship would in any event not have been in use during the time, there can be no recovery for demurrage, since she could have suffered no loss of use.

The decision of Judge De Haven in The Sequoia (D. C.) 132 F. 625, where he allowed only one-half the value of the use of the vessel while she was laid up for collision repairs and was concurrently making other repairs, that were not necessary to render her seaworthy, is contrary to the overwhelming weight of authority. The decision of Judge McPherson in The Bratsburg (D. C.) 127 F. 1005, would likewise seem to be without support, and did not involve demurrage. The following cases enunciate the general rule which I have stated: Admiralty Commissioners v. S. S. Chekiang, [1926] A. C. 637; Ruabon S. S. Co. v. London Co., [1900] A. C. 6; The Alfred, 3 W. Rob. 233; The Acanthus, [1902] P. D. 17; The Haversham Grange, [1905] P. D. 307; The Astrakhan, [1910] P. D. 172; The Saginaw (D. C.) 95 F. 703; Simpson Dry Dock Co. v. Atlantic S. S. Co. (C. C. A.) 108 F. 425; The Bergen (C. C. A.) 128 F. 920; The Conqueror, 166 U. S. 110, 17 S. Ct. 510, 41 L. Ed. 937; The North Star (C. C. A.) 151 F. 168; Hines v. Sangstad (C. C. A.) 266 F. 502; The Winfield S. Cahill (C. C. A.) 258 F. 318; Bouker Contracting Co. v. Pennsylvania R. Co. (D. C.) 299 F. 608; Jones v. United States, 22 F.(2d) 581, 1924 A. M. C. 1089.

The commissioner in the case at bar divided the time during which the Norman Bridge was laid up to make the two classes of repairs, and allowed her owner only half the value of her use during the whole period of detention, on the ground that the authorities which have allowed the injured party loss of use of the ship during the full period have all been cases where there "was a present necessity to effect the collision repairs, either at once or as soon as circumstances would permit, and [where] there was not any present necessity or urgency to make the other * * * repairs."

The commissioner reached his conclusion largely because of the reasoning of the eminent British admiralty registrar, Roscoe, in his book on Measure of Damages in Actions of Maritime Collisions, pp. 70, 71, and also because of the judgment of the Court of Appeal in The Chekiang, [1925] P. D. 80, where the strict rule of The Acanthus, supra, was sought to be modified. But the decision in The Chekiang has been reversed by the House of Lords in Admiralty Commissioners v. S. S. Chekiang [1926] A. C. 637. In The Chekiang temporary repairs had been made on account of a collision on August 22, 1921, at Hankow, China, and the vessel thereafter left for Hong Kong, where she was drydocked and refitted, as well as had permanent repairs made because of injuries from the collision. The refitting occupied from September 7 to November 2, 1921. The permanent repairs occupied 20 days of this time and proceeded concurrently with the others. There is no evidence that after the temporary repairs were made the vessel was unseaworthy, or that the permanent collision repairs were not made at Hong Kong merely because it was convenient to do both sets of repairs during the same period, since before the collision it had been decided to dock the vessel in December, 1921. The admiralty registrar allowed loss of use of the vessel for 20 days and among his reasons for his report said: "It is clearly proved that the decision at once to refit * * * was not taken until after it was decided to repair the collision damage."

The president affirmed the report of the registrar, but the Court of Appeals reversed the case, and sent it back to the registrar to reassess the damages, saying, per Bankes, L. J.: "Has the owner proved that he has suffered any loss and if so how much? If the fact be that the whole of the time during which the vessel was detained was occupied by the repairs necessary to make good the collision damage, and by necessary owner's repairs, the work on both proceeding simultaneously and continuously, and occupying the whole time, the owner in my opinion would fail to establish anything beyond nominal damages. In such a case as that, on his own showing the vessel was not detained a moment longer than was necessary to carry out urgently needed repairs, quite apart from the collision damage. If the question arises, as it does in the present case, whether the repairs carried out by the owner apart from the collision damage, though necessary, would not but for the collision have been done quite so soon, as they were in part done, the matter is not so simple. In every case it must be a matter of degree, and the tribunal whose

duty it is to assess the damages must use his own common sense. There is no rule of law that because the owner's repairs were executed sooner than, but for the collision, they would have been executed, the time occupied by those repairs must be allowed in the time for which demurrage is awarded."

Atkin, L. J., also said ([1925] P. D. at page 94): " * * * If it can be shown that the period of collision damage enabled the owners to execute other repairs, the completion of which otherwise would with reasonable certainty have deprived the owners of some period of beneficial use, the time so saved, with all proper discounts for uncertainty, etc., may properly be taken into account. In this case it is plain that the plaintiffs did not lose the whole beneficial use of the ship during the 20 days in question. They occupied her with her officers and crew during the whole period, and during the same period were engaged in carrying out her usual annual refit."

But all this reasoning was brushed aside on appeal to the House of Lords. Lord Sumner said ([1926] A. C. at page 645): "My Lords, when the Chekiang ran into the Cairo she imposed on the admiralty, as the direct consequence of this wrong, the necessity for docking the Cairo at Hong Kong during the repair of the collision damage. Why should not the Chekiang pay for that docking? Her overhaul was not then due. It had not been determined upon for that time, and the programme of overhauls was itself liable to alteration. The overhaul imposed no extra burden on the Chekiang when it took place; in fact, the dock charges are claimed only to the end of the collision repairs and not till the Cairo left the dock. There is abundant authority for saying that the fact that the owners of an injured ship take the opportunity the docking required for collision repairs to do work on their own ship, which had not already become necessary at the time of the collision, nor was brought about by the owners' negligence contributing to the collision, is no ground for reducing the wrongdoer's liability to make good the damage his wrongdoing has caused."

Lord Phillimore distinctly laid down the rule applicable to such cases in The Chekiang in the following terms ([1926] A. C. at page 753): "If a vessel has got to go into dry dock for a periodical survey for class * * * or to repair previous damage, her detention for repairs due to some collision which occurs after the previous damage or after the determination to put her into dry

dock has been made, will not be a charge against the wrongdoer; otherwise, it will."

The commissioner, in his very interesting and able report, insists that loss by detention should be apportioned, where neither set of concurrent repairs is necessarily made at the time. There is much to be said against many applications of the doctrines preventing contribution in favor of a wrongdoer; but, in my opinion, the decisions are nearly all against such a rule as the commissioner has laid down.

It is perhaps true that in most of the cases where the owner has laid up his vessel for collision repairs, and has been allowed full demurrage in spite of the fact that he found it convenient concurrently to employ the occasion to make other repairs to his vessel, the collision repairs were at that very time necessary. Yet I find no point made in such cases of a present necessity of collision repairs as a basis for allowance of demurrage. I think libelant's advocates are right when they say that such a rule would destroy the principle of "restitutio in integrum" in cases where the vessel *requires* no immediate collision repairs. It would, in fact, force the owner to postpone his collision repairs in such an event until he desired to lay up his vessel for other purposes, or lose his right to demurrage for loss of use of a vessel which he thought it prudent, though perhaps not necessary, to repair at once for the sake of efficiency. It would establish a sort of rule for mitigating damages for the benefit of a wrongdoer, which I believe the law has not recognized in such circumstances. As Lord Sumner said in The Chekiang, [1926] A. C. at page 646: "Nor is there here any question of minimizing the damages. The object of that principle is to prevent a tort sufferer from recovering for damage which is really self-inflicted, because with reasonable effort he could have avoided it. This does not extend to investing the tort-feasor with a right to call on him to do things which do not follow from the collision to diminish liability for the wrong."

Lord Chancellor Halsbury made a similar observation in Ruabon S. S. Co. v. London Co. [1900] A. C. at page 10, where he said as to the right of contribution: "But I cannot understand how it can be asserted that it is part of the common law that, where one person gets some advantage from the act of another, a right of contribution toward the expense of that act arises on behalf of the person who has done it."

The exceptions of the libelant are sus-

tained to the extent of allowing full detention damages for 10 days and full incidental expenses in cases where the commissioner has divided them equally, and those of the respondent are overruled.

Settle decree on notice.