### THE NORTH STAR.

### THE SIR WILLIAM SIEMENS.

### THE ALEXANDER HOLLEY.

(Circuit Court of Appeals, Second Circuit. January 7, 1907.)

#### No. 24.

**1. COLLISION — OVERTAKING VESSELS — RULES GOVERNING PASSING IN ST. MARY'S RIVER.**

Under the rules prescribed by the Secretary of ·the Treasury relating to the navigation of St. Mary's river, supplementary to the statutory rules, and which govern the right of an overtaking vessel to pass another, such vessel is not absolutely prohibited from passing because the vessel ahead fails to assent to her signal, but she may persist in passing provided the place is one where such passing is permitted, and she can safely pass without exceeding the lawful speed, but not otherwise.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, §§ 197–199.

Collision—Overtaking vessel, see note to The Rebecca, 60 C. C. A. 254.]

**2. SAME—VIOLATION OF RULES BY OVERTAKING VESSEL.**

The steamer Siemens with a barge in tow on a. line from 700 to 800 feet long, each loaded with 5,000 tons of ore, was passing down St.

Mary's river, and when the tow was a half mile above the entrance to Little Rapids cut, the steamer North Star, also loaded, overtaking the barge signaled her intention to pass to port. The Siemens answered by a dissenting signal, and kept her course and speed which was 8 or 9 miles an hour. The North Star persisted, and, when a quarter of a mile from the cut again signaled, and the Siemens again dissented. A change of course to starboard was necessary to enter the cut, and, before the Siemens could make the turn with her tow and straighten out in the cut, a collision occurred between her and the North Star, which also entered the cut on her port side, and, as a result a further collision occurred between the two steamers, and between the Siemens and her tow; the cut being but 300 feet wide. By the rules, it was lawful for an overtaking vessel to pass another above the cut, but it was not lawful for a vessel to proceed at a speed greater than 9 miles an hour or to overtake and pass another in the cut. *Held* that the North Star was in fault, not only for violation of the positive rule as to speed, but for a reckless persistence when it was obvious at the time her first signal was answered that she could not pass before reaching the cut; that the Siemens was not in fault, it being her privilege under the rules to maintain her course and speed until she was overtaken, when, and not before, she was required by rule 5 of the secretary's rules to assent to the passing, and slacken to a slow rate of speed, and the situation being such when she received the first signal as to justify her in refusing to assent or to slacken her speed because of her tow.

3. SAME—DAMAGES—DEMURRAGE.

In determining whether earnings have been lost by the owner of a vessel as a result of collision, the inquiry is not whether they could possibly have been made by the use of the vessel during the period of her detention, but whether they would have been made, and, as it cannot be proved that they would certainly have been made except when the vessel had a pending engagement for her profitable use, it suffices if the fact is proved circumstantially, and with a reasonable degree of certainty as that there was an opportunity for the vessel's employment of which the owner would probably have availed himself.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 290.]

4. SAME.

The disallowance by a commissioner of demurrage to vessels injured in collision, on the ground of loss of earnings, *held* sustained by the evidence which showed that the vessels were a part of a fleet owned by libelant and employed on the Great Lakes, and that while cargoes had been offered they had been refused owing to the nearness of the close of the season and other vessels of the fleet had laid up for the winter, prior to the time when the vessels in collision would have completed the voyage they were on.

5. ADMIRALTY—FINDINGS OF FACT BY COMMISSIONER—WEIGHT.

The findings of a commissioner in admiralty on questions of fact depending upon conflicting testimony or the credibility of witnesses should not be disturbed by a court of revision unless clearly erroneous.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 1, Admiralty, § 770.]

Appeal from the District Court of the United States for the Western District of New York.

See 140 Fed. 263.

John C. Shaw, Charles B. Warren, Wm. B. Cady, and Herbert K. Oakes, for appellant.

Harvey D. Goulder, George Clinton, and F. S. Masten, for appellee.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

WALLACE, Circuit Judge. This is an appeal from a decree adjudging the steamer North Star solely in fault for the collision between that vessel and the Siemens which resulted in a subsequent collision between the two vessels, and also between the Siemens and her own tow, the barge Holley.

The facts of the case are fully stated in the opinion of Judge Hazel in the court below, and, as we agree substantially with his findings, it will serve no useful purpose to recapitulate the evidence. The essential facts are these: The collision took place in Little Rapids cut, an artificial channel between submerged rocks, then about 300 feet wide, in the St. Mary's river, in the early morning of a clear day a short distance below the crib lighthouse at the northwestern entrance of the cut. The Siemens was a steel steamship 432 feet long and 48 feet beam, and was loaded with over 5,000 tons of ore to a draft of 18 feet; and she had in tow the Holley, a steam barge 361 feet long and loaded with 5,000 tons of ore. The North Star was a freight steamer 300 feet long with a beam of 40 feet, and at the time was loaded so that she was drawing 16 feet 8 inches of water. The Siemens and her tow were capable of a speed of 10 miles an hour, and the North Star was capable of a speed of 12 miles an hour. The vessels had been moored the night previous at a dock known as the "Government Pier" at Sault Ste. Marie, about a mile and a half above the Little Rapids cut, awaiting daylight to proceed down the river through Little Rapids cut to Lake Huron. The compass course descending the river in mid-channel is approximately east southeast to the mouth of the cut, and thence through the cut is approximately south southeast; and there is a current running about two miles an hour until the cut is reached, and thence through the cut running a mile or more faster. The Siemens had taken her tow on a hawser of 700 to 800 feet, and was proceeding near mid-channel down the river when the North Star, having straightened out on her course, and desiring to enter the cut before the Siemens, blew a signal of two whistles to the Siemans, indicating that she proposed to overtake and pass her on the port side. The Siemens did not respond to this signal, and claims she did not hear it. The vessels proceeded down the river, the Siemens and her tow at a speed of about eight or nine miles an hour over the land, and the North Star on a course to the port of the Siemens and her tow, and at a speed by which she was gradually overtaking the other vessels, until they had reached Bayfield Rock, when the North Star, having overtaken the Siemans' tow, gave another signal of two whistles to the Siemens, indicating her intention to pass the Siemens on her port side. To this signal the Siemens responded by four or more rapid blasts of her whistle, indicating that she did not deem it safe for the North Star to attempt to pass. The North Star was at this time about half a mile above the entrance to the cut. Her master, assuming the signal of the Siemens to be a call to "hurry up," increased the speed of his vessel. After running about a quarter of a mile and observing that the Siemens had not slackened speed, he gave the Siemens a signal of three whistles, as a notice to check her speed. To this signal the Siemens responded with four or more rapid blasts of her whistle, and kept on without change of

course or speed; and the North Star, going at full speed, kept on in her effort to overtake and pass the Siemens. When the Siemens was within a few hundred feet of the entrance of the cut she changed her course to starboard to enter the cut, and thereafter the North Star also changed her course to starboard to enter the cut, and drew abreast of the Siemens. In rounding into the cut the course of the Siemens was that usually adopted by vessels having a tow under similar conditions, and the North Star took a course as far toward the easterly side of the channel as she safely could go. After the North Star and the Siemens had entered the cut, and before either could be straightened upon her course down the channel, and while the North Star was persisting in her attempt to pass ahead of the Siemens, the port bow of the Siemens came into contact with the starboard quarter of the North Star. The impact sheered the bows of both vessels to starboard, and they brought up on different sides of the channel and blocked the channel until the barge Holley, which had put out an anchor without success, was carried down by the current and ran into the Siemens, causing the Siemens, carried by the force of the current, to strike her stern against the North Star.

By the rules of navigation governing St. Mary's river (those of the act of Congress of February 8, 1895, c. 64, § 1, 28 Stat. 645 [U. S. Comp. St. 1901, p. 2886] and those not inconsistent therewith made by the Secretary of the Treasury pursuant to that act and the act of March 6, 1896, c. 49, § 1, 29 Stat. 54 [U. S. Comp. St. 1901, p. 3551]), it is lawful for a vessel descending the river to overtake and pass another vessel between the government pier and crib lighthouse at the northern entrance of the Little Rapids cut; but it is not lawful for a vessel to proceed at a greater speed than nine statute miles per hour over the ground, or for an overtaking vessel to pass a vessel ahead in Little Rapids cut. These rules also, like the general rules of navigation, provide that any vessel overtaking another shall keep out of the way of the overtaken vessel, and that where one of two vessels is required to keep out of the way, the other shall keep her course and speed. Rules 23 and 26 of the act of Congress relate to signals between steam vessels indicating their course to starboard or port, and do not prescribe the signals which are to be used between an overtaking vessel and the vessel ahead. The rule relative to signals between such vessels is rule 5 of the Secretary of the Treasury, as there is nothing in this rule inconsistent with rules 23 and 26 of the act of Congress. Rule 5 provides that in case a steamer desires to pass another going in the same direction on said river, at a point where passing is permitted by the rules, the pilot of the steamer astern shall, if he intends to pass the steamer ahead on the left or port side, indicate such intention by giving two short blasts of the steam whistle; that thereupon the pilot of the steamer ahead shall immediately answer by giving the same signal, unless he does not think it safe for the steamer astern to attempt to pass at that point, when he shall immediately signify the same by giving several short and rapid blasts of the steam whistle; and that under no circumstances shall the steamer astern attempt to pass the steamer ahead until the vessels have reached a point where it can be safely done,

when the steamer ahead shall signify her willingness by blowing the proper signals and shall then slacken to a slow rate of speed, and the steamer astern shall pass.

It is entirely plain that the North Star was in fault for the collision. She was at the time of the collision, and had been for a considerable distance, maintaining an unlawful rate of speed, and the collision occurred when she was attempting to pass the Siemens at a place where it was unlawful for her to do so. These infractions contributed directly to the disaster. These violations of the rules would suffice to charge her with contributory fault; but they are not the only ones of which she was guilty. She was attempting to pass the Siemens, not only without an assenting signal from the latter, but in defiance of dissenting signals. If the master of the North Star put a wrong interpretation upon the signals of the Siemens, he was without legal justification in doing so, as the language of the signal rule is plain, and he was bound to know the rule.

Irrespective of the positive rules of navigation, the conduct of the master of the North Star was not only imprudent, but was rash in the extreme. There was ample width and depth of the channel in the river to permit the North Star to overtake and pass the Siemens and her tow between the government pier and the crib lighthouse, and the North Star would have been justified in attempting to do so between these two points, if the relative speed of the vessels, without exceeding the lawful limit, would have rendered it practicable. She would also have been justified in persisting in the attempt, notwithstanding she had not obtained any assent to her first signal. It is not the meaning of rule 5 to forbid a steamer astern invariably from passing the steamer ahead if the latter does not signify her assent and slacken speed. If the general conditions of navigation and the relative speed of the vessels are such that a steamer astern can safely pass the other, she is at liberty to do so; and she cannot be deprived of her privilege by the neglect or contumely of the steamer ahead. But, it should have been obvious to the master of the North Star when the second signals between the vessels were exchanged, that his vessel could not overtake and pass the Siemens before the vessels would reach the crib lighthouse, if the latter insisted upon her privilege of maintaining her speed. When these signals were exchanged, the North Star had 1,100 or 1,200 feet to go before she could come abreast of the Siemens and pass her bow. During the mile which had been traveled by the vessels after the North Star had given her first signal to the Siemens, the former had gained only a quarter of a mile upon the latter, and to overhaul and pass the Siemens before reaching the crib lighthouse, she would have to maintain a speed of at least 12 miles an hour over the ground. Notwithstanding the dissenting signal, however, the master of the North Star persisted in the attempt, although he observed that the Siemens had not reduced her speed. He knew, or was bound to know, that the vessels would have to make a sharp turn to starboard to enter the cut, and that necessarily the Siemens would have to begin her preparatory movement several hundred feet above the entrance to ensure the proper turning of her tow; that any attempt by his own vessel to pass the Siemens while the latter was rounding

into the cut, because of the size of the vessels, and the comparatively narrow room for the maneuver, would be highly hazardous to both; and that a collision in the cut would be almost inevitable unless his vessel could pass the bow of the Siemens before the latter had turned on her course to starboard. Still he persisted, and signaled the Siemens again although his vessel had not overhauled her. When he received and disregarded the last dissenting signals from the Siemens, she was about ready to commence her turn to starboard. From that time until the vessels came together his conduct was highly culpable, and was practically a challenge to the Siemens to accept a collision unless she would consent to abandon her privilege and reduce her speed to a minimum. The court below was clearly right in deciding that the North Star had been guilty of contributory fault.

The question whether the Siemens was also in fault for the collision depends in part upon the meaning to be given to rule 5. This rule imposes upon the steamer ahead the duty of co-operating with the vessel astern when the vessels have reached a point where they can pass safely. It is not its meaning that the vessel ahead shall give an assenting signal and slacken to a slow speed whenever requested to do so by a vessel astern provided there is room for the latter to pass safely; for if this were the requirement, it would be inconsistent with rules 20 and 22 of the act of Congress. Those rules, which but express the law of navigation that everywhere obtains, recognize the privilege of the vessel ahead to maintain her speed, and the duty of the vessel astern to keep out of the way, until the vessel astern has overtaken the vessel ahead. All rules of navigation are qualified by the fundamental one that in obeying them due regard must be had to any special circumstances rendering a departure from them necessary to avoid immediate danger; and it is the contemplation of rule 5 that when the vessel ahead has been overtaken, and the overtaking vessel is about to pass ahead, the immediate danger which then arises requires that the former shall forego her privilege, and so govern her movements as to assist in avoiding it. Then it is, and not before, that rule 5 means that the vessel ahead, after signifying her willingness by signals, should "slacken to a slow rate of speed."

Thus interpreting the rule, we think the Siemens was not in fault for her failure to give an assenting signal to the first signal from the North Star. Even had it been her duty by the rule to give an answering signal, we agree with the court below that her fault would have been in no sense a fault which contributed to the collision, because subsequently, when she responded with a dissenting signal to the second signal of the North Star, there was ample time and room for the North Star to desist without risk from her attempt to overtake the Siemens. If the master of the Siemens heard the first signal of the North Star, his refusal to consent to the proposition to pass was flagrantly selfish, as it would have entailed only a trifling delay to his vessel, as there was ample opportunity for the North Star to pass his vessel before reaching the crib lighthouse, and if the Siemens entered the cut before the North Star the latter would be subjected to a very considerable delay in reaching Lake Huron. He claims, how-

ever, that he did not hear the first signal of the North Star, and he is supported by the testimony of those on board his vessel.

When the second signals were exchanged the situation had materially changed. The vessels had reached a place where the attempt of the North Star to pass could not be accomplished without a chance that it would interfere with the preparatory movements of the Siemens to enter the cut, and thereby involve some degree of risk to her tow. He was aware that the North Star could not pass the Siemens before reaching the crib lighthouse without exceeding a lawful rate of speed, unless the speed of the Siemens should be reduced to a degree which might possibly be hazardous to the tow.

He ought not to be criticised for refusing to consent to a violation of the law, nor for exercising extreme caution. When the third signal of the North Star was given the situation of the vessels was such that the attempt to pass could only be accomplished at serious risk to the tow, and every consideration of prudence forbade the master of the Siemens from consenting and slackening the speed of his vessel.

We have examined the proofs with care to ascertain whether it can be safely found that the Siemens was guilty of any attempt to thwart the movements of the North Star at or after the time when the former commenced her preparatory movements to enter the cut; and do not think they justify such a conclusion. She was required to begin to change her course several hundred feet above the entrance to the cut, and alter it to starboard four or five points to enter the cut and get straightened down the channel and enable her tow to do so, and in view of her size and the size of her tow, and the length of the hawser to the tow, this movement could hardly be accomplished except by swinging into the cut at or near mid-channel.

We conclude that the court below properly found that the Siemens was free from fault.

Of the award of over $30,000 for the libelant's damages caused by the collision, $12,036 consists of demurrage, the loss alleged to have been occasioned to the libelant by the detention of the Siemens and the Holley. It is insisted for the appellant that the commissioner, to whom it was referred to ascertain and report the damages consequent upon the collision, properly refused to allow this item, and that the court below erred in overruling that part of his report.

The collision took place November 28th, and resulted in the stranding of the two vessels, the necessity for temporary repairs to complete their voyage to Conneaut, their port of destination on Lake Erie, and repairs at Loraine, the nearest port at which the further necessary repairs could be made. Had the voyage not been interrupted by the collision, the vessels would have reached their port of destination, and could have been unloaded and ready to start on another voyage by the afternoon of December 2d. As it was, they were prevented from making another voyage during the season of navigation upon the lakes. The season of navigation was, by the understanding of vessel owners and underwriters, to close December 10th, but, as the ice did not block St. Mary's Canal at that date, some vessels passed through as late as December 17th.

The commissioner found that, if it had not been for the interruption of their voyage, the vessels could, at their owner's option, have been despatched to Duluth, taken on a grain cargo there, and returned to a Lake Erie port within the season of navigation; and, if they had actually done this, they would have earned freight beyond expenses amounting to the item in controversy. But he did not find that they would have been actually sent out upon another voyage; and he based his disallowance of the item upon the improbability, in view of the evidence, that either of them would have been sent by their owner upon another voyage that season. He applied the rule stated in The Conqueror, 166 U. S. 125, 17 Sup. Ct. 516, 41 L. Ed. 937:

"That demurrage will only be allowed when profits have actually been, or may be reasonably supposed to have been lost, and the amount of such profits is proven with reasonable certainty."

When a vessel is employed at the time of the collision, or when it appears that she would have been beneficially employed during the period of her detention, it is entirely clear that actual loss has attended the interruption of her engagements. The Margaret J. Sanford (C. C.) 37 Fed. 148. Her owner is entitled to full indemnity. In other words, he is entitled to compensation measured by his actual loss, including, not only his direct loss, but any consequential loss he may have sustained by deprivation of profit. But his consequential loss cannot exceed that which he actually sustained. In ascertaining whether earnings have been lost by the owner, the inquiry is not whether they could possibly have been made by the use of the vessel during the period for which he has been deprived of her use, but is whether they would have been made. As it cannot be proved that they would have been certainly made, except when the vessel has a pending engagement for her profitable use during the period of detention, it suffices if the fact is proved circumstantially and with a reasonable degree of certainty. The inquiry is determined by the same rules of law which obtain when the owner of any other kind of property seeks compensation for the profits lost by the wrongful interruption of its use. The Baltimore, 8 Wall. 377, 385, 19 L. Ed. 463. It is not necessary for him to show by direct evidence that he would have employed his vessel or his property during the period in such a way that earnings would have accrued to him. In many cases this would necessitate proving his intention at the time, and this might be impossible. It suffices if he shows a state of facts from which a court or jury can find that there was an opportunity for him to do so, and that he would probably have availed himself of it. But if it appears affirmatively, or if the reasonable inference from the facts established is that there was no opportunity or that he would have rejected the opportunity, if offered, it is impossible for a court or jury to find legitimately that he has sustained actual loss.

In the present case, the facts were these: The Siemens and the Holley were vessels of a fleet owned by the libelant, engaged in voyages from ports on Lake Erie to ports on Lake Superior. The fleet consisted of 24 vessels, 12 being steamers, and 12 being barges. Customarily each steamer was despatched with a barge in tow, but no regular towage

arrangement existed, and the barges were transferred at either end of a voyage to different steamers, or returned by a particular steamer, as might best facilitate despatch in transportation. All of the vessels were insured under marine policies, warranting that they should not be navigated after December 10th at noon, except to continue a voyage already begun. The average time occupied by a voyage to Duluth and back by the Siemens and her consort was 10 days; the vessels going without cargo on the up trip. No charters were offered the libelant for either the Siemens or the Holley, but cargoes of wheat for transportation by two of its vessels from Duluth to Buffalo were offered to it as late as November 27th. On that day the libelant accepted two charters for wheat at Duluth. A witness was produced by the libelant, one of two agents in the libelant's office at Cleveland, who testified that two cargoes were offered libelant subsequently to that date, but at what date does not appear, and were not accepted by libelant. He also testified that the reason why they were not accepted was that the only one of the libelant's steamers which would have been available for the voyage was the Siemens, that she was faster than other steamers of the libelant, and if she had not been disabled the libelant would have sent her to Duluth. At the time these charters were offered, three of libelant's steamers and five of its barges were at Lake Erie ports unemployed, and in suitable condition and readiness for making a voyage to Duluth and transporting wheat cargoes to Buffalo. None of these vessels were sent out for another voyage, but all were laid up for the winter. Of the eight other steamers of libelant, which arrived at Lake Erie ports in November with their barges, none was sent out with a barge after November 25th, two were sent out on that day without a barge, and the last sent out at all were sent without a barge—one, the Bessemer, November 29th, and the other, the Morse, November 30th. Except two barges sent out November 25th, all the other barges were sent on their last up-lake trips before November 22d. Upon these facts the commissioner in his report very justly observed that (when the two charters were refused) the season of navigation on the Great Lakes was near the close, the voyages of the fleet were suspended, the vessels were about to go into winter quarters, and one by one libelant's vessels had been laid up for the winter as they arrived at Lake Erie ports. The testimony of the libelant's witness leaves the date at which the two charters were offered, and refused conveniently vague and uncertain. They may have been offered on November 21st, after but on the same day of the acceptance of the two of that date. They may have been offered as late as December 2d. He knew of the collision on November 28th, the day on which it occurred, and he knew that if it had not occurred the Siemens and the Holley would not have been able to undertake another voyage before December 2d. It seems extremely improbable that he would have been willing to despatch these vessels within eight days of the expected close of navigation on a 10 days' voyage. He did not state how much faster the Siemens was than were the other steamers which could have been despatched for the voyage. He did not state that the refusal to accept the last two charters offered was placed upon the ground that the Siemens was disabled; nor did he give

a single fact to corroborate his statement that the charters would have been accepted if she had not been disabled. The case for the libelant rests upon the naked statement of this single witness respecting his state of mind. We think the commissioner was justified in rejecting this statement, and in reaching the conclusion that the two charters were not accepted because the libelant was unwilling to send out any of its vessels at so late a day as December 2d, and was therefore unwilling to contract. The functions of a commissioner, to whom it has been referred to take the evidence and report his opinion to the court respecting damages, are analogous to those of masters in chancery (Admiralty Rule 44), and his findings upon questions of fact depending upon conflicting testimony, or upon the credibility of witnesses, should not be disturbed by the court of revision, unless they are clearly erroneous. La Bourgogne (C. C. A.) 144 Fed. 781; Davis v. Schwartz, 155 U. S. 631, 636, 15 Sup. Ct. 237, 39 L. Ed. 289; Tilghman v. Proctor, 125 U. S. 136, 150, 8 Sup. Ct. 894, 31 L. Ed. 664.

It follows that the commissioner's report, as to the item disallowed, was erroneously overruled by the District Judge.

The decree is modified, with costs to the appellant, and with instructions to the court below to decree conformably with this opinion.