## AKTIESELSKAPET BONHEUR v. SAN FRANCISCO & P. S. S. CO.

### THE BEAVER.

(Circuit Court of Appeals, Ninth Circuit.   March 5, 1923.)

No. 3906.

1. **Collision ⬅136—Compensation for delay not allowed, if there was no demand for employment of ship.**

    If there is no demand for the employment of a ship, so that no hire was to be obtained, no compensation for detention for repairs will be allowed as part of the damages sustained by collision.

2. **Collision ⬅123—Injured vessel has burden of proving loss of earnings.**

    The libelant, seeking to recover damages sustained by a vessel in a collision, has the burden of establishing that the ship lost earnings while detained for repairs.

3. **Collision ⬅136—Offer for use of vessel, which would not have been approved by chartering committee, does not establish market value of use.**

    On libel to recover damages sustained by a vessel in a collision, proof that an offer to charter the vessel for a stated sum had been made to the libelant does not show the damages for detention of the vessel while being repaired, where the offer was on terms which would not have been approved by the chartering committee of the government, without whose approval the ship could not have obtained a license to sail.

4. **Collision ⬅125—Evidence held to show ship could not have been used during time needed for repairs.**

    Evidence that libelant had two vessels in port, one of which was injured in a collision, and that negotiations for a charter of the two vessels and for the approval thereof by the chartering committee of the Shipping Board and by the Interallied Chartering Committee were not obtained until some time after the repairs were completed, though negotiations, principally by telegraph, were continued throughout that period, *held* to show that the ship would have earned nothing during the time she was detained for repairs, so that the libelant was not entitled to recover for such detention.

5. **Collision ⬅136—Wages and supplies for men on vessel pending repairs are allowable only as part of demurrage.**

    In fixing the damages recoverable for a collision, expenses, as for wages paid watchmen, coal consumed in cooking, and supplies for the men during the time the vessel was undergoing repairs, were allowable only as part of the demurrage charges, so that there could be no recovery for those items, where the evidence showed libelant was not entitled to demurrage.

On Appeal from the District Court of the United States for the First Division of the Northern District of California; Maurice T. Dooling, Judge.

Libel in admiralty by the Aktieselskapet Bonheur against the steamship Beaver, of which the San Francisco & Portland Steamship Company was claimant. From a decree giving damages for injuries to libelant's vessel, but denying recovery for her detention, libelant appeals. Affirmed.

Nathan H. Frank and Irving H. Frank, both of San Francisco, Cal., for appellant.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Farnham P. Griffiths and McCutchen, Olney, Willard, Mannon & Greene, all of San Francisco, Cal., for appellee.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge. On the evening of November 3, 1917, the steamer Beaver collided with the motor vessel Bayard, while the latter was lying at anchor, in the harbor of San Francisco, opposite Pier 30 and about one mile distant therefrom. The appellant libeled the Beaver, claiming damages for injuries sustained by the Bayard, and also for loss sustained by reason of the boat's detention from operation while under repairs. The appellee is the claimant. It will be convenient to refer to the parties as libelant and claimant. The claimant admitted liability for the collision, at the trial, but denied liability on account of demurrage. The trial court gave damages for injuries to the vessel, but denied relief for her detention. The Bayard was detained, in making repairs, from November 3d to December 21st, inclusive.

The Bayard and the Brazil, which was a companion ship, were both owned in Norway, a neutral country in the war. Fred Olsen & Co., of Christiana, Norway, were their managing owners, and the Norway-Pacific Line Agency, of which F. W. Kutter was secretary, was the agent of such owners in San Francisco. Geo. A. Moore & Co. had chartered the Bayard for two trips previously, and on November 3, 1917, made an offer to the San Francisco agent of $400,000, lump sum, for a charter round trip from San Francisco to two points in the Philippines and return. Moore & Co. were advised that the offer would be cabled to Norway, and consideration would be given to it. However, no further negotiations seem to have been had respecting the offer.

Early in October, 1917, what was known as a chartering committee was appointed by the United States Shipping Board. J. B. Smull was a member of that committee, and took over the part of the work relating to "the business of the steamers and steamer chartering." Smull says:

"Yes; the approval of all charters for the steamers comes before the committee as a whole, and the approval of a charter is not granted, unless two of the committee of three agree that such charter should be granted, but the details of working out the conditions of chartering steamers are left with me."

The committee received its instructions from the chairman of the United States Shipping Board, and was to have supervision of all charter parties to carry goods to and from this country in vessels under all flags; the charter parties not to be approved until all their conditions met with the approval of the committee. The committee was likewise to have the approval of all voyages where no charter party existed. The chartering committee worked also in connection with the War Trade Board in the matter of granting licenses for bunkers and stores on steamers and sailing vessels, and, from the beginning, it was the rule of the War Trade Board not to grant a bunker license to

a sailing vessel, or steamer, or motorship to a foreign port, unless its records showed that the charter party or the voyage had been approved by the chartering committee. It was the aim on the part of the War Trade Board, working in co-operation with the chartering committee, to prevent any vessel from leaving without first having the charter and voyage approved by the chartering committee, unless there were strong reasons, which would have to be taken into consideration in some particular instances.

According to Mr. Smull's testimony, there existed at the time an agreement between England and Denmark and other neutral countries, including Norway, whereby such neutral countries could not charter their vessels without the approval of the Interallied Chartering Committee in London. After approval by the chartering committee of the Shipping Board of this country, the owners of such neutral vessels were required to obtain also the approval of the Interallied in London before they were allowed to enter upon the voyage. The chartering committee early adopted a policy, the better to control shipping commodities and conserve the needs of the government in war times, of endeavoring to get all neutral boats on time charter to reputable American houses, for round trips, both Pacific and Atlantic, and to that end it discouraged lump sum charters, and fixed maximum rates on time charters at 45 shillings per dead weight ton. The fixing of maximum rates was one of the first things that the committee did after its organization about October 1st.

The Bayard and Brazil are ships of similar construction, and, as the negotiations for the chartering of both proceeded much on the same lines, it will be convenient and instructive to follow them together. The Brazil came into San Francisco harbor on November 13th, 10 days after the collision of the Beaver with the Bayard. The crucial question presented for consideration is whether the libelant is entitled to what is termed demurrage for detention of the Bayard during the time she was undergoing repairs, and, if so, in what amount.

[1] Libelant claims that the amount of its demurrage should be measured by its charter value in the market, for the time of detention, and that, having had a bona fide offer of $400,000 for charter on the ship, round trip to the Philippines and return, the offer establishes the value and fixes the basis upon which recovery should be predicated. Under some circumstances, the market value affords an appropriate basis for determining the damages to be paid for detention; but in any case, if there is no demand for the employment of the ship, and, of course, no hire to be obtained, no compensation for detention for repairs will be allowed, as no loss will have been sustained. Williamson v. Barrett, 13 How. 101, 111, 14 L. Ed. 68. "It is equally well settled, however," says the court in The Conqueror, 166 U. S. 110, 125, 17 Sup. Ct. 510, 516 (41 L. Ed. 937), "that demurrage will only be allowed when profits have actually been, or may be reasonably supposed to have been, lost, and the amount of such profits is proven with reasonable certainty." "Two things are absolutely necessary," says Dr. Lushington, in The Clarence, 3 W. Rob. 283, in order to entitle a party to be indemnified for what is termed consequential loss,

being for the detention of a vessel, "actual loss, and reasonable proof of the amount." Later the learned jurist continues:

"It does not follow, as a matter of necessity, that anything is due for the detention of a vessel whilst under repair. Under some circumstances, undoubtedly such a consequence will follow, as, for example, where a fishing voyage is lost, or where the vessel would have been beneficially employed. The onus of proving her loss rests with the plaintiff."

Where the damages alleged to have been sustained in the interim of detention arise by reason of loss of earnings, the inquiry is not whether they could possibly have been made by the use of the vessel, but whether they would have been made; and, as anticipated earnings of the vessel cannot always be certainly ascertained and definitely proven, it suffices if they are proven circumstantially and with a reasonable degree of certainty. Like rules are applicable to those which obtain when the owner of any other kind of property seeks compensation for profits lost by interruption of its use. The North Star, 151 Fed. 168, 175, 80 C. C. A. 536, 543. The court says, further:

"It is not necessary for him to show by direct evidence that he would have employed his vessel or his property during the period in such a way that earnings would have accrued to him. In many cases this would necessitate proving his intention at the time, and this might be impossible. It suffices if he shows a state of facts from which a court or jury can find that there was an opportunity for him to do so, and that he would probably have availed himself of it. But if it appears affirmatively, or if the reasonable inference from the facts established is that there was no opportunity or that he would have rejected the opportunity, if offered, it is impossible for a court or jury to find legitimately that he has sustained actual loss."

The authorities seem to lead to but the one conclusion, that damages for loss of the use of a vessel while undergoing repairs made necessary by collision will only be allowed when it is shown that she could have been profitably employed during the period of her detention for repairs. The Loch Trool (D. C.) 150 Fed. 429.

[2] It has become a controversy somewhat respecting the burden of proof. Naturally, it lies with the libelant to establish the damage sustained on account of loss of earnings of the ship while detained for repairs, on like principle as the burden was upon it to establish the damages arising from the collision. No different principle applies in the one case from that in the other. What is sufficient prima facie to make a case in the first instance might be a subject of inquiry, but it is not essential to deal with that under the circumstances attending the controversy.

[3] It is at once obvious that the offer of Moore & Co. of $400,000 for a charter on the Bayard, under the circumstances and conditions present, did not establish a market value for the use of the vessel. The evidence renders it practically certain that the chartering committee would not have approved the charter party at that rate. The committee had previously, or about that time, fixed the maximum rate on neutral vessels sailing from the port of San Francisco at 45 shillings per dead weight ton. The Moore offer could not have been confirmed in less than from one to two weeks, on account of the condition of the cables reaching Norway, where it was necessary to

communicate with the owner or managing owners. The committee adhered to the policy subsequently with but one exception, as the evidence shows, and in that instance, in allowing a lump sum charter, the rate was reduced to practically the equivalent of the 45-shilling rate. We refer to the ship Arabien. So that, prima facie, the offer could, under no conditions, be considered to have established a market value above a rate that would have been approved by the chartering committee. The vessel could not be chartered without the approval of the committee.

[4] But the more serious inquiry is respecting whether libelant has shown that it could or would have used the ship at all during the interim of her detention for repairs. There was a decided disposition manifested, on the part of libelant, from the first, not to yield to the maximum rate established by the chartering committee. This is inferable more particularly through its dealings with the Brazil, as shown by the telegrams in the record.

The first endeavor the record shows to obtain a charter on the Bayard is a telegram by the American Asiatic Company, Inc., directed to the chartering committee, of date December 5, 1917, advising that it had offered $170,000, lump sum, for steamer Arabien, one way Seattle to Japan ports; also $270,000 for motorship Bayard, round trip San Francisco to Japan and return, or Atlantic coast, and advising further:

"That owners these steamers will not charter on government form time basis, but will place same on berth themselves for other ports."

The committee replied the same day, disapproving $170,000 on Arabien, but advising that they would approve $130,000, and requested information respecting total dead weight carrying capacity of motorship Bayard. The capacity of the Bayard was wired the committee on the same day. On the 6th, the committee declined "fixing" Bayard at present. At this juncture, the American Asiatic Company seems to have discontinued its efforts to obtain a charter on the Bayard. On the 7th of December, G. W. McNear, Inc., wired the chartering committee that they were offering for Brazil and Bayard 45 shillings per ton on time charter for round trip, either to New Zealand and Australia or Orient, and requested approval. On the same day the committee replied that they would approve Brazil and Bayard, but that Shipping Board, Washington, must have priority on homeward bound business. On December 15th, McNear telegraphed the committee, advising that, as respecting Bayard, the Textile Alliance had wool cargo to ship from New Zealand to San Francisco, and requesting approval of this, instead of vessel returning via New Caledonia. The committee replied on same day indicating its approval, but requested advice touching full particulars in regard to same, and again wired respecting the Bayard that they had accepted wool business tentatively from the Textile Alliance, New York, "with whom please communicate and have Textile Alliance or yourselves arrange with Interallied Chartering Committee, London, by cable for approval of business."

On December 18th, McNear telegraphed the chartering committee

that the London agents of Fred Olsen & Co. had cabled agents in San Francisco, referring to Brazil and Bayard:

"Subject obtaining approval of Shipping Board and homeward cargoes these vessels we have fixed full cargoes bagged wheat and or flour from Australian port Galveston St. John New Brunswick range."

On December 21st, McNear telegraphed the chartering committee, subject Bayard and Brazil, urging them to bring strong pressure on Interallied, and expressing a fear that they would not let go. The committee wired McNear on the 21st:

"Bayard Brazil Washington authorizes us to wire you to go ahead on these vessels as per your telegram. * * * If you get confirmation from owners we will endeavor to get Interallied to agree to the voyages of both vessels. On homeward voyages we must have priority as per your telegram."

And again on the same day:

"Bayard Brazil still waiting hear from Interallied Committee London for their approval return Pacific Coast as we would prefer this trade both steamers."

On the 22d McNear wired the committee that he had cabled owners of Bayard and Brazil:

"Shipping Board approves New Zealand Australia but retaining right to indicate priority return cargoes."

On the 24th, McNear again wired that agent of owners had cabled that day:

"Bayard Brazil charters signed awaiting your approval."

On the same day, the committee wired:

"Bayard Brazil British approval comes from London so far no word received."

On December 27th, McNear wired the committee, replying to wire of 21st, expressing regret if there had been any misunderstanding, but advised that agents of owners had cabled firm offer Bayard and Brazil "our account forty-five shillings time charter terms delivery here redelivery here." And on January 4, 1918, McNear again wired:

"Norway Pacific Line Company have cable from London agents of owners 'Interallied agreed Bayard Brazil proceed New Zealand Australia return wool Pacific Coast understand Interallied cabled States authorities that both wheat charters canceled.'"

As it respects the Brazil, it further appears, from a telegram of date November 27th, addressed by W. R. Grace & Co. to the chartering committee, that the vessel was offering for six months charter at 60 shillings; and on December 6th, by wire addressed by the same company to the committee that:

"On offering this vessel [the Brazil] forty-five shillings accordance your telegram November 27th owners replied they preferred waiting before chartering at this rate."

The bunker licenses were not issued for either the Bayard or Brazil until January 14, 1918, and the ships did not sail until on that date or afterwards. Thus was concluded a continued series of negotiations

respecting the chartering of the ships Bayard and Brazil, extending over a considerable length of time. The Bayard, as we have seen, was detained in receiving repairs from November 3 to December 21, 1917. These negotiations extended over a much longer time, and charter regulations for the Bayard were not completed until January 4, 1918, some 14 days after she had completed her repairs. The fact that the vessel was undergoing repairs need not have delayed the owners in procuring a charter. Indeed, reasonable foresight would have suggested that a charter be procured at once, or as soon as it could reasonably be done, considering the shipping conditions existing at the time, and the shipping regulations, on the part both of this country and England, to be observed, made necessary on account of war conditions then existing. After the lapse of the offer made by Moore & Co. for a charter on the Bayard, which must have been very soon, as no further negotiations were had in that relation, it was not until December 5th that any offer was made for a charter on the Bayard. This offer the chartering committee refused to approve. On the 7th began the long-continued effort of G. W. McNear, Inc., to obtain charters upon both ships, the Bayard and the Brazil.

It is quite evident, from the series of telegrams noted above, that the owners were resisting the demands of the chartering committe in two particulars: First, as it respects the acceptance of 45 shillings time charter terms; and, second, as to the commodity to be carried homeward. It will be noted that owners did not cable firm offer of 45 shillings, time charter, until about December 27th; nor did they consent to a wool cargo from New Zealand and Australia until about January 4, 1918.

The fault, it must be observed, was not alone with the owners of these vessels. There was considerable negotiation between the Shipping Board and the Interallied Committee of London; the former insisting that both ships should return with wool cargo, while the latter preferred that grain should be carried. And it was not until near the end of the negotiations, nor, indeed, until about the time that the owners cabled their firm offer of 45 shillings, time charter, and agreed to a return wool cargo for both ships, that the charter was consummated.

Obviously, nothing in the way of enforced detention stood in the way of an early charter for the Brazil. Freight was offering in abundance all the time, and the vessel could have been on its way in a very short space of time, with a full cargo, if the owners, the chartering committee, and the Interallied Committee could have readily come to terms respecting charter rates and the commodities to be carried homeward. It is quite clear, therefore, aside from the fact of the Bayard's detention for repairs, in view of the attending conditions and the disposition of the owners to resist the chartering committee's restrictions, that the Bayard was not, and could not have been, available for use at once; nor would the several parties have reached an understanding, as they finally did, prior to about January 4, 1918. Such being the case, the libelant has lost nothing by the detention of the Bayard in the meantime from November 3d to December 21st for repairs. The vessel would have earned nothing during that time,

whether it had been detained for repairs or not. Hence no demurrage has accrued by reason of the detention.

[5] Libelant claimed, in connection with the damages allowed arising from the collision, certain items of expense, as for wages paid watchmen, coal consumed in cooking, and victualing men, during the time the vessel was undergoing repairs. These were disallowed by the court. Damages were awarded for the physical injuries to the vessel in the sum of $58,096.15, and the inquiry is: Should these items be awarded in addition? We are of the view that such items of expense are referable to a demurrage claim, for time lost while the ship was undergoing repairs, and, the libelant not being entitled to demurrage, it should not be allowed the expenses. The Tremont, 161 Fed. 1, 88 C. C. A. 304.

Affirmed.