**TODD ERIE BASIN DRY DOCKS, Inc.,
v. THE PENELOPI et al.**

**No. 255.**

Circuit Court of Appeals, Second Circuit.
April 30, 1945.

Dow & Symmers, of New York City (Wilbur E. Dow, Jr., Joseph M. Brush, and Sherman V. Petrie, Jr., all of New York City, of counsel), for appellant.

Crowell & Rouse, of New York City (E. Curtis Rouse and George L. Varian, both of New York City, of counsel), for appellee.

Before SWAN, CHASE, and FRANK, Circuit Judges.

SWAN, Circuit Judge.

The original libel in this consolidated cause was filed by a dry dock company, for brevity called Todd, to recover some $23,400 for work performed on the S. S. Penelopi to convert her from a coal to an oil burner. The vessel was delivered at Todd's shipyard on September 2, 1941 and was redelivered to her owner on December 27, 1941. The owner, for brevity called Polar, filed a cross-libel for damages resulting from the wrongful detention of the vessel beyond the date alleged to have been agreed upon for completion of the work. After issues were joined, the parties agreed by stipulation [1] that the amount due Todd should be fixed at $20,500, that the steamer was delayed at the shipyard for an unexplained period of 31 days, and that the cases should be consolidated and a reference had to ascertain the damages, if any, sustained by Polar by reason of such delay. An interlocutory decree was entered in accordance with the stipulation and hearings were had before a commissioner who reported Polar's damages as $25,530 for demurrage and $1,176.50 for expenses of crew during the detention period. Both sides filed exceptions to the report. The final decree, from which Polar has appealed, allowed as damages only the $1,176.50 item, and awarded half costs to each party.

Before passing to the merits, we turn to the appellee's contention that the appeal must be dismissed because the final decree recites that it was entered on motion of Polar's proctors. This is a complete misapplication of the rule that a party may not appeal from a judgment rendered by consent, as this court explained in The Ansaldo San Girgio I, 2 Cir., 73 F.2d 40, 41, aff'd sub nom. The Ansaldo San Giorgio I v. Rheinstrom Brothers Co., 294 U.S. 494, 55 S.Ct. 483, 79 L.Ed. 1016 without mention of this point. It seems strange that this obviously fallacious contention should be again advanced. The appeal is properly here.

The vessel was redelivered to Polar at 5 P. M. on Saturday, December 27, 1941. By charter dated January 10, 1942, she was chartered to Moore-McCormack Lines, Inc., for a voyage to South America and return "taking approximately three months." Delivery to the charterer was made on January 13, 1942 and charter hire was paid at the rate of $4.50 per deadweight ton per calendar month from the time of delivery up to and including midnight of January 19, 1942, and at $3.25 thereafter. These rates were the ceiling rates specified by the U. S. Maritime Commission, which then had the authority now vested in the War Shipping Administration. The deadweight tonnage stated in the charter was 10,660 tons. Based on the voyage account covering the charter voyage the commissioner determined the average daily net earnings and in accordance therewith computed damages for demurrage.

The unexplained detention period was from 5 P. M. on November 26 to 5 P. M. on December 27, 1941. It is undisputed that during this period there was a strong demand for tonnage. Upon the reference Todd contended first, that the vessel could not have been chartered during the detention period because of (a) alleged "blacklisting" by the British authorities, (b) lack of classification certificate, and (c) lack of ship warrant and certificate of insurance, and, second, that she would not have been chartered because of Polar's reluctance to accept the ceiling rates of charter hire. The commissioner dealt with each of these contentions in detail and found that the vessel could and would have been chartered during the detention period. He did not, however, allow demurrage for the full 31

---

[1] "(1) That the suits upon the above-mentioned libel and cross-libel be consolidated.

"(2) That the damages of the libelant be and they are hereby fixed at the sum of Twenty Thousand Five Hundred ($20,500.) Dollars, with interest from December 27, 1941.

"(3) That in making the repairs referred to in the libel and cross-libel herein, the Steamship 'Penelopi' was delayed in the shipyards of the libelant for an unexplained period of thirty-one (31) days beyond the number of days contracted for.

"(4) That the Second Cause of Action alleged in the cross-libel herein be dismissed without costs to either party.

"(5) That an interlocutory decree be entered herein referring it to a Commissioner to determine the damages, if any, sustained by cross-libelant by reason of the aforementioned delay.

"(6) That the said Commissioner find and report to the Court the net amount, if any, due and payable to either the libelant or the cross-libelant, as the case may be."

days of the detention but fixed the period for damages at 23 days because of Polar's delay, after redelivery, in cleaning the vessel so as to make her ready for chartering. The district judge allowed no demurrage on the ground that the proof fails to show that Polar was willing to accept any charter offer during the detention period.

█ In so far as the court's decision rests on the statement in the opinion that it was incumbent on Polar .to prove "that it was willing to charter the vessel to some known agent for a specified voyage at an agreed rate," we think it imposes a rule of proof more exacting than the controlling authorities require. In The Conqueror, 166 U.S. 110, at 125, 17 S.Ct. 510, 516, 41 L.Ed. 937, Mr. Justice Brown stated that demurrage "will only be allowed when profits have actually been, or may be *reasonably supposed* [2] to have been, lost, and the amount of such profits is proven with reasonable certainty." In The North Star, 2 Cir., 151 F. 168, 175 Judge Wallace said that the inquiry is whether earnings would have been made by the use of the vessel, and he explained that it suffices if the owner "shows a state of facts from which a court or jury can find that there was an opportunity for him to do so, and that he *would probably have availed himself of it.*" [2]

█ In so far as the decision on appeal rests on a reversal of the commissioner's findings that the vessel could and would have been chartered, it can be approved only if those findings are clearly erroneous. The North Star, supra, 151 F. 168 at page 177; Western Transit Co. v. Davidson S. S. Co., 6 Cir., 212 F. 696, 701, certiorari denied 234 U.S. 764, 34 S.Ct. 998, 58 L.Ed. 1582; P. Sanford Ross, Inc. v. Public Service Corporation, 3 Cir., 42 F.2d 79, 80; Crowell v. Benson, 285 U.S. 22, 51, 52 S.Ct. 285, 76 L.Ed. 598, note 14.

█ We believe that there is substantial evidence to support the findings of fact made by the commissioner as to the ability and willingness of Polar to charter its vessel. He found that the fact that the Penelopi during the period of its repair did not obtain a British or American ship warrant, did not have a classification certificate and did not hold a certificate of insurance did not preclude ability to make a charter, for in fact the Penelopi was chartered to Moore-McCormack Lines without either ship warrants or classification certificate.

As to the willingness of Polar to charter its vessel, it was proper to conclude from the evidence that the Penelopi was not chartered during the detention period because its owner was unwilling to incur the financial risk involved in fixing a charter without assurance of an approximate delivery date by Todd. The appellee argues that the Penelopi was not chartered because its owners wanted more money than could be obtained at the then ceiling rates of the Maritime Commission. It is true that Polar's offer of a charter to Moore-McCormack Lines included terms whereby the owner would get not only the legal rates of charter hire but also a division of profits that the charterer might make; but this demand was abandoned as soon as it appeared that the approval of the Maritime Commission could not be obtained, and the commissioner very reasonably inferred that Polar would not have acted differently had the vessel been available 31 days earlier. His report considers all of appellee's contention so fully that further discussion of the evidence is unnecessary.

█ We do not agree with the commissioner's ruling that although the period of wrongful detention was 31 days, the appellant is entitled to damages for only 23 days. This was based on the theory that the duty of cleaning and painting the vessel to make her ready to charter was on the owner, that the time reasonably required for such work was eight days, and, therefore, during the first eight days of .the detention period she lost no hire by reason of the wrongful detention. But the question is not what hire she lost during the detention period but what loss of hire did the detention cause. Whether the vessel was delivered November 26 or December 27 she would be off hire during the eight days necessary to put her in readiness for chartering. The wrongful detention therefore caused her to begin earning hire 31 days later than she otherwise would. The fact that actually she was off hire for sixteen days intead of eight because the owner did the work unnecessarily slowly is, as the district judge said, immaterial, since during those days the ceiling prices fixed for charter hire remained unchanged. Demurrage should be computed for thirty-one days.

█ The average net daily earnings of the vessel under the Moore-McCormack charter were found to be $1110. The com-

---

putation was based on a deadweight tonnage of 10,400 tons instead of the 10,660 tons stated in the charter and according to which charter hire was collected from Moore-McCormack Lines. In the prior charter the vessel's tonnage was stated as about 10,450 tons and in the subsequent charter to the War Shipping Administration as about 10,400 tons. The latter figure accords with the Lloyd certificate dated October 13, 1942. In the absence of an explanation of the apparent discrepancies the commissioner adopted the 10,400 figure. We think he was justified in so doing; the probability that a charter made during the detention period would have based hire on a tonnage of 10,660 seems too speculative.

The appellee contends that the voyage account was inaccurate and incomplete, and that in any event a single voyage is insufficient to furnish a fair basis for determining rental value. Cases cited in support of the latter point are inapplicable, because the ceiling rates of the Maritime Commission determined the hire that could be obtained, and precluded negotiation of an unusually favorable contract. The criticisms of the voyage account were not raised upon the reference until the submission of Todd's reply brief. As the commissioner points out these criticisms should have been voiced before the close of the testimony or application made to reopen the hearings. In the absence of timely objections the voyage account was properly received in evidence. See The Conqueror, 166 U.S. 110, 127, 17 S.Ct. 510, 41 L.Ed. 937.

There remains for discussion the appellant's claim that special damages should have been allowed on the theory that had the vessel been available earlier it could have been chartered at a rate of $4.50 for the entire period and would not have been subject to the reduced rate of $3.25 which became effective at midnight of January 19, 1942. There is at least some evidence that the Maritime Commission reserved the right to change maximum charter rates after they had already gone into effect, although there is no showing that rates were ever changed under such circumstances. However this may be, the commissioner's decision can be supported on another ground. The appellant claims special damages either on the basis of a voyage to the Persian Gulf and Red Sea area or else on the basis of a voyage to South America. It is clear, we think, that there was no likelihood that the Penelopi would have been sent to the Per-

sian Gulf. Not only was the usual business of the vessel the South American trade but it was indicated in a letter that the owners preferred not to send the ship to the Persian Gulf. Nor can special damages be computed on the basis of a South American voyage; for, as the commissioner found, the length of such a voyage was not established with reasonable certainty. It is true under the Moore-McCormack charter the voyage took four months and seven days; but that the period might have been shorter is clear, since the Maritime Commission estimated the voyage at "approximately three months", as did the parties in their charter. The commissioner rightly held that the proof of special damage was too speculative.

The decree is reversed and the cause remanded for computation of damages in accordance with this opinion. Since the decree to be entered will be in favor of Polar we think it should be awarded all costs in the district court as well as appellate costs.