# THE ATHENE.

## LEX LABORATORIES, Inc. v. UNITED STATES.

District Court, S. D. New York.
July 18, 1947.

Hill, Rivkins & Middleton, of New York City (George B. Warburton, of New York City, and James M. Hastie, of Great Neck, of counsel), for libelant.

John F. X. McGohey, U. S. Atty., of New York City (Edwin Longcope, of New York City, of counsel), for respondent.

KNOX, District Judge.

On May 31, 1943, the motorship Athene, owned by libelant, was sunk off the coast of Florida as a result of a collision with respondent's steamship, John Owen.

Pursuant to an interlocutory decree, dated December 3, 1945, awarding libelant 50 per cent of its damages for the total loss of its vessel, the issue as to the fair value of the craft, at the time of sinking, was referred to Anthony M. Menkel, Esq., as Special Commissioner. All other claims arising out of this collision had previously been disposed of.

Hearings were had before said Commissioner in May and June, 1946, following which, and to obviate the necessity of examining additional witnesses, certain stipulations were entered into between proctors for the respective parties, and the reference closed. The evidence consists of 666 pages of testimony and approximately 75 exhibits.

On August 28, 1946, the Commissioner, after consideration of the above record, the exhibits and the extensive briefs on behalf of both parties, filed his report, fixing the value of the Athene at $95,000, as of the date of loss.

Respondent has excepted to this finding on the ground that the Commissioner

"* * * fixed the value of the auxiliary yawl Athene at $95,000, instead of $35,000."

Libelant now asks that respondent's exceptions be overruled; that the Commissioner's report be confirmed in all respects, with the direction that a final decree be entered awarding to libelant damages in the amount of $47,500 (being 50 per cent of the value found by the Commissioner).

At the outset, it is noted that Admiralty Rule 43, 28 U.S.C.A. following section 723, provides that Commissioners shall have and possess all the powers in the premises which are usually given to or exercised by Masters in Chancery in references to them.

It is further provided by Admiralty Rule 43½, 28 U.S.C.A. following section 723, that the reports of the Commissioners shall be treated as presumptively correct, but shall be subject to review by the court, and the court may adopt the same, or may modify or reject the same in whole or in part, when the court, in the exercise of its judgment, is fully satisfied that error has been committed.

In this connection in the case of The North Star, 2 Cir., 151 F. 168, 169, 177, Judge Wallace said: "The functions of a commissioner, to whom it has been referred to take the evidence and report his opinion to the court respecting damages, are analogous to those of masters in chancery, * * * and his findings upon questions of fact depending upon conflicting testimony, or upon the credibility of witnesses, should not be disturbed by the court of revision, unless they are clearly erroneous."

The process to be followed in arriving at a fair valuation of a totally lost vessel is set forth in the case of Standard Oil Co. v. Southern Pacific Co., 268 U.S. 146, 45 S.Ct. 465, 467, 69 L.Ed. 890. Justice Butler, speaking for the court, there declared: "In case of total loss of a vessel, the measure of damages is its market value, if it has a market value, at the time of destruction. The Baltimore, 8 Wall. 377, 385, 19 L.Ed. 463. Where there is no market value, such as is established by contemporaneous sales of like property in the way of ordinary business, as in the case of merchandise bought and sold in the market, other evidence is resorted to. The value of the vessel lost properly may be taken to be the sum which, considering all the circumstances, probably could have been obtained for her on the date of collision; that is, the sum that in all probability would result from fair negotiations between an owner willing to sell and a purchaser desiring to buy. Brooks-Scanlon Corporation v. United States, 265 U.S. 106, 123, 44 S.Ct. 471, 68 L.Ed. 934. * * * The ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts. Minnesota Rate Cases, 230 U.S. 352, 434, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A., N.S., 1151, Ann.Cas.1916A, 18. * * * In view of changed prices, the original cost of the vessel was not useful as a guide to her value when lost. In The Clyde, 1 Swabey 23, Doctor Lushington, speaking of what a vessel would fetch in the market, said (page 24): 'In order to ascertain this, there are various species of evidence that may be resorted to—for instance, the value of the vessel when built. But that is only one species of evidence, because the value may furnish a very inferior criterion whereby to ascertain the value at the moment of destruction. The length of time during which the vessel has been used, and the degree of deterioration suffered, will affect the original price at which the vessel was built. But there is another matter infinitely more important than this—known even to the most unlearned—the constant change which takes place in the market. It is the market price which the court looks to, and nothing else, as the value of the property. It is an old saying, "The worth of a thing is the price it will bring."' And see City of Winona v. Wisconsin-Minnesota Light & Power Co., D. C., 276 F. 966, 1003."

" 'Restitutio in integrum' is the leading maxim applied by admiralty courts to ascertain damages resulting from a collision (The Baltimore, supra [8 Wall. at page], 385, [19 L.Ed. 463]), and, on the same principle, value is the measure of compensation in case of total loss."

■ See also, the recent decision of Judge Leibell of this court in the case of Ozanic v. United States, D.C., 68 F.Supp. 296, 299, involving the total loss of a vessel during World War II. He said: "It is obvious from the rule of these cases that when a vessel is lost as a result of collision during a time of war when there is no open market to determine value, then the market value must be determined from all the available circumstances and relevant facts giving consideration to their proper weight and bearing. The supplementary questions of relevancy and weight are not as clearly defined as the general rule. In Standard Oil Co. v. Southern Pacific Co., supra, the court found that the cost of reproduction in a period of high costs, prices and wages was a relevant factor, and that proper depreciation was a relevant fact, considered in relation to reproduction costs. The court excluded original cost of the vessel as a relevant factor or useful guide in determining value, because of changed prices and enhanced values brought about by the influence of war. * * *"

Judge Leibell also made reference to Rule 3 of the Report of the Advisory Board on Just Compensation to the War Shipping Administration, as follows: "Where market value cannot be determined by sufficient sales or hirings of vessels of like character, made at or about the time of taking, it is to be determined by the Administrator from a consideration of cost of construction, acquisition cost so far as relevant, improvements, replacement costs, depreciation, earnings, physical condition, appraisals for insurance or other purposes, and any other relevant facts upon which a reasonable judgment for value can be based. These various matters are to be given such weight by the Administrator, as in his opinion they are justly entitled to, in determining the price that would probably result from fair negotiations between an owner willing to sell and a purchaser desiring to buy."

From a perusal of the record made before the Commissioner, it appears that the M. S. Athene was built as a racing yawl in 1899 by W. T. Herrsehoff, who conducted an outstanding boat yard, at a cost of $27,-125, excluding sails and engine. She had a length of 83.4 feet between perpendiculars, and was 113 feet overall. Her breadth was 19.2 feet, and she had a depth of 10.8 feet. In 1939, she was equipped with a Gray engine having a horse power of 165 Brake, six cylinders. When used as a yacht, the vessel had a sail area of 4500 cubic feet. In 1940, this area was reduced somewhat, by new standard rigging, and new running rigging in 1941. The Athene had a lead keel of about 20 tons, a $CO^2$ fire extinguisher, together with electric light and refrigerating systems. The purchase price of the Athene, when she was bought by libelant in June, 1942, was $15,000. The actual cost of her conversion to libelant's needs, plus incidental outlays, from June until September, 1942, was approximately $20,000.

Respondent claims that this total of $35,000 is equivalent to the fair market value of the Athene as of the date of her loss.

■ Libelant, on the other hand, takes the position that the yawl had a value of $110,000, and asserts that its total capital expenditures in connection with the vessel, aggregated $74,338.33. This sum, it is admitted, includes the fees and expenses of persons who procured the craft, supervised its conversion, and obtained permission to sail, along with wages of crew members, for a considerable period prior to the date of her first sailing.

While some of these expenditures may be open to question on the ground that they cannot properly be regarded as capital outlays, the Commissioner correctly held that "some of the payments made for overseeing her conversion plus necessary expenses to Washington to procure priorities for materials necessary for the Athene's conversion," should be added to the original cost of $35,000.

■■ At the time that the Athene met with disaster, she was insured for $30,000 hull war risk, and $25,000 marine hull risk, and the latter sum was paid to libelant by her underwriters.

The record reflects a discrepancy as to the vessel's cargo carrying capacity after her conversion. Chappel, one of the li-

belant's witnesses, was the Vice President and plant superintendent of the company that converted the Athene. He testified that after she had been repaired and refitted, she had a hull capacity of 50 tons.

Bendix, another witness for libelant, stated that from his records as a shipbroker, the Athene as an auxiliary yacht was 82 tons gross register, and 52 tons net register, but after her conversion to a cargo vessel, it was impossible to state her cargo tonnage capacity inasmuch as she had no load line and that none was required. In the course of his examination, Bendix said to his examiner: "You mentioned the Athene was 50 tons, the vessel carried 50 tons of cargo. I have no advice on that at all. I don't know if anybody in the world knows how a vessel without a load line has 50 tons capacity. This vessel, I figured, has 162 measurement tons. That is the only way you can figure because she had no draft markings. * * * It simply leaves it to the Captain's jurisdiction, how deep he is going to load the vessel; and this vessel, according to the survey I have, is required—has 6500 cubic feet. If she has 6500 cubic feet for cargo bale, she can only be registered as 162 measurement tons. How many weight tons depends upon the Captain you have on it?"

Tarasca, another of libelant's witnesses, when being cross-examined, said that following conversion, the Athene had a cargo capacity of 6500 cubic feet. He verified the fact that there was no load line, and added that Mr. Hargan, a Martin surveyor, estimated her cargo capacity in weight tons. The witness then continued: "I believe we figured it out between 84 and 100 tons. I don't exactly remember what it was, cargo capacity in weight tons over and above her stores and fuel." This statement obviously is indefinite and susceptible to different interpretations. Indeed, respondent argues that Tarasca's testimony in this respect is nothing more than an expression of a hazy recollection, which is both inaccurate and contrary to the testimony of Chappel. On the other hand, the Commissioner found that "after her conversion she (the 'Athene') has about 6500 cubic feet of cargo space or between 84 and 100 tons over and above stores and

fuel. * * * I believe the testimony of libelant's witness Tarasca, who testified to the capacity of the Athene on the bases of the Martin surveyor's measurement, as 84-100 tons or 6500 cubic feet capacity."

It would have been well had the parties or the Commissioner elicited further evidence on this point. However, since the Commissioner had the opportunity to observe the witnesses and to appraise the value of their testimony, I will permit the Commissioner's finding to remain undisturbed.

Most of the record before the Commissioner has to do with evidence offered by both parties with respect to the selling and offering prices of vessels which are claimed to have been comparable to the Athene as of dates approximating the day of her demise. Without undertaking a resumé of the testimony on this subject matter, it is apparent that the Commissioner considered this proof and reached conclusions therein that cannot be said to be clearly erroneous.

One of the important features of this case was as to whether due to the existence of war conditions, the value of the Athene was thereby increased.

Respondent's expert witnesses have contended that these conditions would in no way increase the value of the Athene beyond her purchase price, plus actual cost of conversion. Libelant's expert witnesses, to the contrary, testified that the market value of all types of vessels, in good condition and available for cargo carriage, was greatly enhanced by reason of the hostilities that were then prevalent. Here again, I shall not disturb the Commissioner's findings. He specifically states that he was favorably impressed by libelant's proof, and unimpressed by some of that which was offered by respondent.

The Commissioner's view was that the actual cost of the yacht Athene in June, 1942, plus costs of her reconversion from a yacht to a cargo vessel, during the period from July to September, 1942, does not necessarily reveal the true value as of May, 1943. He thought her value may have been materially enhanced above and beyond libelant's capital expenditures. When purchased by libelant, the Athene's value as

a yacht was comparatively slight. There was little or no demand for vessels of that type. Fuel restrictions were such as to make it practically impossible to operate the engines of pleasure craft. On the other hand, in 1942 and 1943, there was a critical need and great demand for cargo carrying vessels of all descriptions.

In my opinion, the Commissioner was also justified in observing that respondent's witnesses made no proper allowance for the market value of cargo carriers for civilian use.

In exceptional instances, only, was a private owner of a vessel permitted to handle cargo between American and foreign ports.

Respondent's witness, Jagle, stated that while there was no increase in the valuation of cargo vessels the size of the Athene, or less, the value of larger cargo vessels was increased by wartime conditions. This witness, in fixing the value of the Athene at $30,000, seemed to ignore the fact that the Athene was actually engaged in foreign trade and I agree with the Commissioner that this factor would add to her value. Libelant's witness, Bendix, specifically considered these two points and gave the vessel a valuation of $110,000. The Commissioner, I think, was quite accurate when he said: "This case has almost all the conditions mentioned in the Proteus-Cushing case, supra [The Proteus (The Cushing), 2 Cir., 292 F. 560], that is, in May 1943, 'the immediate demand for ships was greater than the supply; the shipyards were working to full capacity; wages and prices were high; the trend of construction costs was upward, and the element of time was of the utmost importance,' as testified to by Bendix."

He, likewise, found that the Athene was a necessary and profitable investment, apparently sufficient for the business of libelant, and based on her continued performance, large profits were anticipated, at least during the first few months following the collision.

On the whole, the Commissioner's report is adequately supported by the evidence, and the same will be confirmed and respondent's exception overruled.