**PALLMA et al. v. FOX et al.**

United States District Court
S. D. New York.

July 3, 1947.

See also D.C., 93 F.Supp. 142.

Leonard Zissu, New York City (Abraham Marcus, Leonard Zissu, New York City, of counsel), for plaintiffs.

Fitelson & Mayers, New York City (Julian T. Abeles, Edwin P. Kilroe, New York City, of counsel), for defendants.

GODDARD, District Judge.

This is a motion by the plaintiffs to confirm a report of a Special Master appointed by the late Judge Mandelbaum, upon an accounting pursuant to an interlocutory decree of this court, and defendants' objections to the report.

The original action was for damages for breach of contract, recission and an accounting.

The plaintiffs were the owners of a music publishing business and they, pursuant to an agreement dated March 20, 1928, sold their business to the defendants who were also music publishers.

The contract provided that defendants were to pay plaintiffs stipulated royalties upon the sales of various types of sheet music and music folios or books, and in addition, one half of the defendants' earnings from the various rights, including the per-

forming rights and motion picture synchronization rights of the original compositions transferred to the defendants.

Plaintiffs sought an accounting claiming that defendants had failed to account for and pay the amounts due them under the contract.

Judge Mandelbaum, after trial of the issues, handed down an opinion with findings of fact and conclusions of law, and rendered an interlocutory decree in which it was ordered that a Special Master be appointed to ascertain "the sums to which plaintiffs are entitled from defendants pursuant to a true and accurate accounting in accordance with the agreement of the parties dated March 20, 1928, from the date of March 20, 1928 until the date of the said accounting."

The Master, after holding hearings intermittently over a period of more than three years, and after argument—both oral and by submission of briefs, handed down his report. The Master considered and passed upon seven separate items. Of these only two are now questioned. These two items as stated by the Master are as follows:

"A Bulk Revenues

"These include all the revenues derived by defendants from licensing the combined Pallma and Fox catalogs, the performing rights revenues received from ASCAP and the motion picture synchronization revenues. Defendants concede that performing rights revenues [the ASCAP revenues or distributions] have not been credited to the plaintiffs, and that plaintiffs are entitled to a share thereof. The difference between the parties is the proportion which should be allocated to the plaintiffs. As to synchronization revenues, defendants, although admitting plaintiffs' rights to share therein, contend that they have fully credited them with amounts calculated by defendants as a proper amount on a 'peruse' basis. Plaintiffs contend that they are, to the extent that such revenues constituted bulk revenues derived from the co-mingled catalogs, entitled to share therein on a percentage basis as in the case of ASCAP revenues."

"B Folio Royalties

"Defendants accounted for the sale of 8,115 folios [music published in book form] each of which contained a single Pallma composition and nine compositions from Fox catalog, at 1¢ per book. Plaintiffs contend that the royalty provided by the contract was 10% of the marked list price [concededly $1.00] or 10¢ per book."

In reviewing the decision of the Master the court shall first consider the finding of the Master as to the folio item. The Master made the following finding of fact:

"5. The defendants never gave properly itemized, complete, accurate and semi-annual statements to the plaintiffs * * *".

And also the following conclusion of law:

"3. The defendants committed a wilful breach of their obligation by failing to account to the plaintiffs * * * for royalties for the use of Pallma compositions in book or collection form."

The Master found that the defendants accounted for the folio sales on the basis of "at 1¢ per Book Royalty" as being the plaintiffs' proportional share of 10% of the marked list price. The Master rejected this accounting on the ground that it was contrary to the provision of the contract of March, 1928. The contract provided that "If published in book form or collection form, a royalty of 10% of the marked list price" was payable to the plaintiffs.

The defendants argued before the Master that since a folio or book contained ten (10) compositions and of the ten there was only one of the plaintiffs, the plaintiffs were entitled to their proportional share, namely one-tenth of ten percent of one dollar or one cent on each folio, totalling $81.15 for 8,115 folios.

The defendants offered testimony to sustain their theory, but the Master, after considering the testimony, the surrounding circumstances of making the contract, the other provisions of the contract, concluded that the contractual provision called for no other interpretation than that the plaintiffs were to receive 10% of the marked

list price of the folios so long as at least one of the plaintiffs' compositions was included therein and that they would receive 10% even with more than one included in the folio. He rejected the contention that the plaintiffs were limited to a proportional share of the 10%.

Since there is sufficient evidence to support the Master's finding and it is not clearly erroneous, this court must accept it as controlling on this review. Pioneer Import. Corp. v. S. S. Lafcomo, 2 Cir., 159 F.2d 654; Todd Erie Basin Dry Docks v. The Penelopi, 2 Cir., 148 F.2d 884, 886; Crowell v. Benson, 285 U.S. 22, 51, 52, 52 S.Ct. 285, 76 L.Ed. 598.

The Master's finding is therefor accordingly confirmed.

The second and more important item for review is that entitled "Bulk Revenues". This item consists of two different sources of revenue. One source of revenue is that derived from the American Society of Composers, Authors and Publishers, hereinafter referred to as ASCAP, for the performing rights; and the second source is that revenue derived from the licensing in bulk of the compositions of the combined catalogs for the purpose of motion picture synchronization.

These two phases of the accounting form the main portion of the Master's report. The Master, as was necessary, dealt with them in great detail.

The Master found that the defendants from March 20, 1928 to March, 1946 received a total of $456,014.93 for the performing rights from ASCAP, and that from March 20, 1928 to December 31, 1945 the defendants received $648,408.81 from synchronization rights.

After considering a number of elements in the evidence and set forth in his report, he arrived at the conclusion that the plaintiffs' catalog with its respective importance should be credited with producing 9⅝% of the revenue derived by the defendants from ASCAP of which plaintiffs are entitled to one half or 4⅚% of the ASCAP revenue plus interest.

The defendants now assert that the Master's determination is arbitrary and errone-

ous as being without support in the evidence. The defendants also assert that the plaintiffs' recovery should be limited to the period of six years prior to the institution of an action in October, 1939. This latter contention may be dismissed summarily for the District Court, although having this question before it, ordered an accounting from 1928 to date.

For the purpose of clarifying the issues for consideration it is necessary to state just what the Master held and the merits of defendants' objections.

The District Court when it filed its opinion, findings and conclusions, included as a conclusion therein the following: "The defendants co-mingled the Pallma catalog with their own catalog and derived revenue by licensing the combined catalogs in bulk for performing rights and motion picture synchronization rights so that the revenue of the catalogs was likewise co-mingled."

In order for the Master to determine what part of the ASCAP revenue belonged to the plaintiffs, it was necessary for him first to determine just how ASCAP operated. He found that ASCAP is a voluntary organization. The purpose and function of the organization are to acquire from its members the performing rights in their musical compositions, to license the performance of the same, collect the revenue and distribute such revenue to its members; that the receipts of ASCAP are comprised of license fees paid by broadcasters, hotels, dancehalls, theatres, cafes and other places where music is rendered. Such users pay an annual license fee for the privilege of rendering any of the music in the ASCAP repertoire and the amount paid for the particular year does not depend upon the amount of such use.

The Master held that the main question to determine is what effect the Pallma catalog had insofar as ASCAP distribution of revenue to the defendants. He proceeded to ascertain ASCAP'S method of distribution. He found that prior to 1936 ASCAP'S entire revenue was first divided into two equal pools; one for the composers and authors, and the other for the publishers. A Classification Committee of ASCAP, under a formula, allocated to each publisher

member his share of the publisher's pool. The Committee classified each publisher's member in its discretion on the basis of the musical compositions in each members catalog, their importance, vogue and popularity, all of which necessarily represented intangible and non-mathematical elements.

The Master further found that these elements were component parts of what ASCAP catagorically designated "availability". The particular share to which a publisher was entitled was based 75% on availability and 25% on "seniority". This seniority was determined by assigning certain "credits" to a publisher for his past classification and these credits accumulated over the period of the publisher's membership constituted his "seniority" for current distribution.

The Master further found that in 1936 ASCAP instituted a new method of allocating to the publishers their share of the publishers' pool. The publisher's share of the performing rights money was divided in half and 50% was distributed on a "performance" basis. Records of the performance over the four major national network radio stations, of each and every composition of ASCAP, were kept and each composition was credited every time it was performed and a so-called point system applied. For the period involved in any distribution each composition would be given a point value in accordance with the number of performances, a sum of money calculated for each point, and each publisher received the amount of money represented by the aggregate points credited to all of his musical compositions. The other 50% was divided on the same classification basis as before, except that 30% was figured as current classification [availability] and 20% on past accumulated classification "seniority".

The Master held that a determination of the plaintiffs' share of the ASCAP revenue necessarily being based upon intangibles was not susceptible of mathematical certainty.

From the above he concluded that "this difficulty has been occasioned solely by the defendants. Although their contract required them to keep an account into which

all of the revenue derived from the Pallma compositions were to be credited, they affirmatively chose, *with respect to performing revenue,* to co-mingle the two catalogs and derive a revenue from licensing the co-mingled catalog."

Since it was the action of the defendants which created the confusion of the revenues he held that they must bear the risk of any inequalities arising out of the accounting, citing Bigelow v. R.K.O., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652.

It is the application of the above doctrine which is the initial point of the defendants' objection. Defendants based their objection on the following grounds: (1) The contract provided that the defendants list the plaintiffs' numbers in their catalog; (2) that ASCAP advised them that the performing rights to the plaintiffs' catalog could only be administered through the inclusion in their catalog of the numbers of the plaintiffs' catalog; (3) the plaintiffs acquiesced and agreed to the administration of their catalog as suggested by ASCAP.

The Master found that the contract provided that the defendants were to keep an account into which all of the revenues derived from the plaintiffs' compositions were to be credited. This finding was in accord with the court's finding of fact No. 3.

The Master applied the doctrine of Bigelow v. R.K.O. supra, not because the defendants co-mingled the catalogs but because they co-mingled the revenues derived therefrom, in contravention of their contractual obligation.

Even assuming that the contract provided, as the defendants contend, that the plaintiffs' catalog should be co-mingled with the defendants, the contract could still provide, as the Master found, for a segregation and allocation to the respective catalogs of the sums realized by the co-mingled catalogs without being inherently inconsistent.

The fact that ASCAP advised how the compositions of plaintiffs' catalog could be utilized has nothing to do with how the sums realized from their utilization were to be accounted for.

Since the Master had sufficient evidence in the record to warrant his finding that the defendants wilfully violated their contractual obligation and must bear the risks of any uncertainties in the accounting, this court is bound by that finding. Pioneer Import. Corp. v. S. S. Lafcomo, supra.

The defendants object to the Master's conclusion that the Pallma catalog should be credited with producing 9⅔% of the revenues · realized from ASCAP. They urge that the premises upon which the Master's conclusion is founded are arbitrary and erroneous and contrary to the evidence.

The Master found that the acquisition of the plaintiffs' catalog by the defendants was an inducing cause for the Classification Committee of ASCAP to increase the rating of the defendants and hence to increase the performing rights revenue realized by the defendants. This finding was based on the fact that in October of 1927 defendants' rating was decreased from A to C. Then in February, 1928 defendants were notified that their classification was changed from "C" to "B" which the Master states meant a substantial increase in revenue from ASCAP.

The Master finds that since no proof had been offered to show that the increase from C to B was the result of anything other than the addition of the plaintiffs' catalog, he concluded that it must have been an inducing cause.

The record does not contain a scintilla of evidence to show that the Classification Committee considered the acquisition of the plaintiffs' catalog in re-rating the defendants. There is no direct evidence or testimony as to what, if anything, the Classification Committee considered in re-rating the defendants.

There is some uncontradicted evidence to indicate that the Classification Committee did not consider the Pallma acquisition in its re-rating and also some evidence to indicate that the Committee may well have been induced to act because of a factor having nothing to do with the Pallma Catalog.

At the time the defendants were demoted in their classification for the third quarter of 1927, the defendants ranked seventh in performance. Subsequently in a survey taken in November of 1927 the defendants' rating rose to fourth and they, in November, 1927, then protested to the Classification Committee. They were advised that the Classification Committee would consider their protest when it convened, which was not until April, 1928, and at that time defendants were notified that their protest had been favorably acted upon.

There is also in evidence a letter from Edwin Claude Mills, Chairman of the Administration Committee of ASCAP, in which he states that "The addition of the Pallma credits to yours would have no effect upon your standing." Mills testified that he did not know what, if any, weight the Classification Committee gave to the data which formed the basis of the statement in his letter. The Master rejected the letter of Mills on the ground that it was merely his personal opinion and that he was not a member of the Classification Committee.

It is true that although this court may differ with the Master as to the weight to be given to the evidence, his findings where based upon evidence in the record are final. Pioneer Import. Corp. v. S. S. Lafcomo, supra. However, the Master's finding that the acquisition of the Pallma catalog was a producing cause for the defendants increase in rating lacks any support in the evidence. It was because of the very fact that there was not any evidence to explain the increase in rating that he made his finding.

In order to make a finding from an inference, the inference must be based on probability and not possibility and must be reasonably drawn from and supported by the facts on which they purport to rest, and may not be the result of mere surmise and conjecture. There must be facts proved from which the inference can be drawn and an inference of fact may not be drawn from a premise which is wholly uncertain. Kenney v. Washington Properties, 76 U.S.App.D.C. 43, 128 F.2d 612, 146 A.L.R. 1; Kentwood Lumber Co. v. Illinois Cent. R. Co., 5 Cir., 65 F.2d 663, 665 and cases therein cited. This rule likewise pre-

vails in the courts of the State of New York. Blum v. Fresh Grown Preserve Corp., 292 N.Y. 241, 54 N.E.2d 809; People v. Scharf, 217 N.Y. 204, 205, 211, 111 N.E. 758; New York State Labor Rel. Bd. v. Select Op. Corp., 183 Misc. 480, 486, 49 N.Y.S.2d 294, reversed on other grounds 269 App.Div. 766, 55 N.Y.S.2d 117, affirmed 295 N.Y. 684, 65 N.E.2d 329.

It is clear therefor that this finding that the acquisition of the Pallma compositions was a producing cause for the defendants' increase in rating, is neither supported by the evidence nor a permissible inference capable of being drawn from the evidence now in the record.

■ The next finding the Master made in arriving at his conclusion was that the Pallma compositions as prorated over the twenty year period was about a 6% producing cause of the 100% revenue derived by the defendants from ASCAP over the twenty year period. The finding was based upon two premises. I—That in March, 1932 the defendants sent ASCAP a letter seeking an increase in rating and relied upon a total of thirty-three of their best and most popular musical compositions which included two of the Pallma numbers. The Master concluded from this "that purely on a mathematical basis the Pallma compositions constituted a trifle more than 6% of all the compositions upon which defendants relied in requesting a better classification for the purposes of performing rights revenue."

The defendants object to this primary finding being used as a basis for the Master's conclusion because the communication from which the Master extracted the list contained other statements upon which the defendants assert they relied in seeking an increased rating. The defendants in this communication, part of which the Master extracted as a basis for his conclusion, stated that the defendants "own hundreds of active and valuable compositions." They further set forth the names of some fifty authors who contributed to their catalogs. The communication further states that some eighty-five composers and authors, members of ASCAP, contributed to their catalogs. That portion of the communication which the Master extracted is premised with the statement "It might be well also to mention some of the numbers in our catalogs, etc." This statement clearly shows that the enumeration of the thirty-three compositions was only for the purpose of setting forth an additional and incomplete reason for an increase in rating. This fact is substantiated by the following language in that letter—"and many other numbers too numerous to mention."

The second premise upon which the Master relies is the result of an informal survey made in 1927 by E. C. Mills, which the Master states shows a comparative "radio" performance for Pallma compositions of about 6%. The Master submitted that the word "radio" in his report was a typographical error and it should be "ratio". This survey showed that Pallma compositions had the following credit rating:

Theatre 13; Dance Halls 3; Hotels 9; Total 25, whereas the defendants' catalog for the same period showed—

Theatre 3990; General 193; Radio 104. No matter whether the word be "radio", as obviously it was not, or "ratio", at no time did the Pallma credits approximate 6% of any item or the aggregate of the defendants' credits.

Both of the premises used by the Master as a basis for his percentage are clearly against the weight of the evidence and cannot be sustained.

The task assigned to the master was a difficult one and it was not lightened by the record made before him. Although this court held that the Master's application of the principle that the defendants must bear any inaccuracies arising out of the accounting because they are the wrongdoers, is proper, this court does not think it is reasonable and equitable to arbitrarily deprive the defendants of monies rightly theirs.

■ The record has been scrutinized in an attempt to discover some evidence from which a norm may be obtained so as to fairly rate the plaintiffs' catalog insofar as it may have been a producing cause of the revenues derived from ASCAP by the

defendants from 1928 to date. With the record as it now stands it is impossible to ascertain any accurate or approximately accurate performance value of the plaintiffs' compositions for the years 1928 to 1936. Any such finding would be so unwarranted by the evidence as to be a miscarriage of justice. However, for the years 1936 to date, the record does contain some evidence to indicate the performance value for that period, of the plaintiffs' catalog.

As pointed out previously, in 1936 ASCAP introduced a new method of distribution whereby 50% of the publishers' pool was distributed on a performance basis. Records were kept of the performance of all ASCAP compositions with each performance and a point system applied. For the period involved in any distribution each composition would be given a point value in accordance with the number of performances and a sum of money calculated for its points. The publisher received the amount of money represented by the aggregate points credited to all his compositions.

The defendants submitted the actual performance records from 1936 to date of the Pallma compositions. The Master rightly rejected these figures as not being indicative of the performance value of the plaintiffs' catalog prior to 1936. However, his refusal to use these figures as a basis for the performance value of the plaintiff's compositions for the years 1936 to date is not justified for the records themselves are the best evidence of the performance value of the plaintiffs' catalog for the period.

It is true that the other 50% of the publishers' pool was for the purpose of distribution based 30% on current classification and 20% on past accumulated classification, "seniority". The only possible flaw in using these records would be the difficulty in determining the plaintiffs' catalog's effect on the defendants past classifications [seniority] since the records of present performances would be a relative indication of the catalog's effect upon current classification. Even with that possible exception this would be a reasonably accurate method of computing the performance value of the plaintiffs' compositions.

From 1936 to the end of the first quarter of 1946 the plaintiffs' catalog had 12,690.1 performing credits as compared with 805,-260.8571 for defendants' catalog, a ratio of approximately one and one-half per cent [.015]. The total monies received from ASCAP by the defendants for this period was $289,074.49. The plaintiffs' catalog was therefore approximately a one and one-half percent producing cause, or approximately $4,336.117 of the total. The plaintiffs are only entitled to a half of $4,336.117 under the contract, giving them $2,168.06 plus interest at the rate of 6% for ten years or 60%, giving a total of $3,468.90. Therefore, for the period of 1936 to the end of the first quarter of 1946 the plaintiffs are awarded $3,468.90, subject to the deductions made by the Master. As to the period preceding 1936 the cause is remanded to the Master to ascertain some reasonable percentage.

The defendants object to the finding by the Master as to the amounts due the plaintiffs from the motion picture synchronization revenues realized by the defendants. The Master found that the plaintiffs were entitled to an additional $18,750.66 from the defendants for motion picture synchronization revenue. He arrived at this figure of $18,750.66 by taking what he held to be the revenues received by the defendants from licensing by "bulk" contracts as distinguished from "per use" contracts [$562,944.70], and deducted a figure representing the amount derived from "per use" contracts [$175,000], leaving a figure of $387,944.70. In the absence of any other relevant data he then applied the same percentage [4⅝%] as he did to the ASCAP revenue.

Without going into detail it will suffice to point out two basic errors in this finding.

The court has already disposed of the finding as to the percentage representing the plaintiffs' catalogs performance value as above indicated.

The percentage of 4⅝% as found by the Master is wholly without support in the evidence and appears to be clearly in ex-

142

cess of the true value. This error alone would suffice to remit the cause. However, another clear error appears to have occurred in his computing a final figure against which the percentage could be applied. He found that insofar as the revenue realized from motion picture synchronization was concerned it was derived from three different types of contract. The first category was purely a "bulk" contract wherein a producer paid a given sum for the right to use any one or all of the compositions in the catalogs and payment was not dependent upon use. The second category was that type of contract in which a producer agreed to pay a certain sum for each use of a composition but guaranteed a minimum annual payment. This the Master likewise held to be a "bulk" contract. The third category was where a producer was to pay a stipulated price for each use of a composition. This type was held to be a "per use" contract.

He then determined the revenues derived from contracts which fell into his first and second categories. He held that the third category, namely the "per use" category need not be considered and he allocated no amount for this. The sum and substance of his holding was that $562,944.70 was the total amount realized by the defendants from the use of "bulk" contracts and that the plaintiffs were entitled to share in that amount. But when he fixes the share of the plaintiffs he deducts $175,000 as revenue derived from "per use" contracts, from $562,944.70 the revenue derived from "bulk" contracts. Thus he negates his entire reasoning previously made and deprives the plaintiffs of an amount which he held they were entitled to.

The Master's report insofar as it treats what the Master calls "Bulk Revenues" cannot be confirmed.

The cause is remanded to the Special Master to ascertain what the plaintiffs are entitled to from the ASCAP revenues for the years prior to 1936, and to ascertain what the plaintiffs are entitled to from the funds realized from synchronization rights.

Except as herein stated the Master's report is confirmed.